# EXHIBIT 1

# ATTACHMENT 2

## SERVICE TERMS AND CONDITIONS

## TABLE OF CONTENTS
### SERVICE TERMS AND CONDITIONS

**PART I.    GENERAL TERMS AND CONDITIONS FOR INTELSAT SERVICES**

1. DEFINITIONS ........................................................................................ 3
2. APPLICABILITY OF TERMS AND CONDITIONS ................................ 4
3. MODIFICATION OF ORIGINAL TERMS AND CONDITIONS ............ 4
4. APPLICABLE TECHNICAL STANDARDS ............................................ 4
5. APPLICABLE CHARGES AND PAYMENT TERMS ............................. 6
6. SERVICE RESTORATION/PRIORITY OF SERVICES .......................... 9
7. APPLICABLE LICENSES ...................................................................... 11
8. SERVICE INTERRUPTION/OUTAGE CREDITS; ASSIGNMENT OF ALTERNATIVE CAPACITY ................................................................. 14
9. MOST FAVORED CUSTOMER (MFC) ................................................. 14
10. CONVERSION OF SERVICES .............................................................. 24
11. INTELLECTUAL PROPERTY ............................................................... 25
12. TERMINATION OR SUSPENSION OF SERVICE ............................... 26
13. LIMITATION OF LIABILITY ............................................................... 29
14. ASSIGNMENT ...................................................................................... 30
15. CONFIDENTIALITY ............................................................................. 30
16. GOVERNING LAW ............................................................................... 31
17. DISPUTE RESOLUTION ...................................................................... 31
18. NOTICES ............................................................................................... 31
19. FORCE MAJEURE ................................................................................ 32
20. WARRANTY .......................................................................................... 33
21. WAIVERS .............................................................................................. 33
22. RIGHTS CUMULATIVE; INVALIDITY ............................................... 33

**PART II.    SERVICE-SPECIFIC TERMS AND CONDITIONS**

A.    Terms and Conditions for Lease Services
B.    Terms and Conditions for Channel and Carrier Services
C.    Terms and Conditions for Occasional Use Services
D.    Terms and Conditions for Demand-Based Services
E.    Terms and Conditions for Cable Restoration Services

**PART III.    INTELSAT TECHNICAL STANDARDS, GLOSSARY AND DEPLOYMENT PLANS**

ANNEXES:

Annex 1 –    Applicable Discount Rates for Lump-Sum Payment of Full-Time Non-Pre-emptible Transponder Lease Services

Annex 2 –    Standard and Premium Capacity

Annex 3 –    DAMA Forms

Annex 4 –    Agreed-Upon Procedures

**PART I.       GENERAL TERMS AND CONDITIONS FOR SERVICES**

## 1.    DEFINITIONS

1.1    "Company" shall mean Intelsat U.K., Ltd., a company incorporated under the laws of England and Wales.

1.2    "IESS" shall mean Intelsat Earth Station Standards set forth in Part III of the Terms and Conditions, as may be amended by the Company from time to time in accordance with Part I – Section 4.1.

1.3    "Intelsat Technical Standards" shall mean the IESS, SSOG and other technical standards applicable to the services offered hereunder.

1.4    "Like Contract" shall mean a Novated Contract, which Contract, when compared to the applicable Post-Privatization Service Order, meets the like-term parameters set forth in Part I – Section 9.

1.5    "Novation Agreement" or "this Agreement" shall mean the agreement among the Company, INTELSAT and the applicable customer pursuant to which each Contract for services between such customer and INTELSAT are novated to the Company, and to which these Terms and Conditions are appended and form a part.

1.6    "Novated Service Rate Schedule" shall mean the schedules of service rates set forth in Part II of the Terms and Conditions.

1.7    "Post-Privatization Service Order" shall mean a Service Order accepted by the Company after the Closing.  This shall not include extensions or recommitments of Novated Contracts.

1.8    "Service Order" shall mean an order of Satellite Capacity via the Space Segment and related services to be submitted by the Customer to the Company, in accordance with the applicable ordering procedures for such service.

1.9    "SSOG" shall mean Satellite Systems Operations Guides set forth in Part III of the Terms and Conditions, as may be amended by the Company from time to time in accordance with Part I – Section 4.1.

1.10    Capitalized terms used but not otherwise defined herein or in the Glossary set forth in Part III of these Terms and Conditions shall have the meanings set forth in the Novation Agreement.

Attachment 2, Part I

## 2.   APPLICABILITY OF TERMS AND CONDITIONS

2.1   <u>Terms and Conditions</u>.

The terms and conditions set forth herein apply to Contracts novated to the Company pursuant to the Novation Agreement (the "Novated Contracts").

2.2   <u>Specific Terms and Conditions</u>.

The specific terms and conditions applicable to each Novated Contract will include (i) the general terms and conditions set forth in Part I of these Terms and Conditions and (ii) the service-specific terms and conditions applicable to each particular service which are set forth in Part II of these Terms and Conditions.  Part II of these Terms and Conditions includes service-specific terms and conditions for the following services:

(a)   Lease Services;
(b)   Channel and Carrier Services;
(c)   Occasional Use Services;
(d)   Demand-Based Services; and
(e)   Cable Restoration Services.

2.3   <u>Customer's Right to Resell</u>.

The Customer shall be entitled to resell any of the services provided to it hereunder, provided that the Customer shall remain liable for the compliance of the operation of such resold services with all applicable Terms and Conditions hereunder.

## 3.   MODIFICATION OF ORIGINAL TERMS AND CONDITIONS

The Company and the Customer each acknowledges and agrees that certain of the original terms and conditions that were applicable to the Contracts prior to the Closing Date will no longer be applicable following the Closing Date and that from and after the Closing, these Terms and Conditions amend and supercede in their entirety all other previous agreements, arrangements and understandings relating to the provisions of such services to the Customer.

## 4.   APPLICABLE TECHNICAL STANDARDS

4.1   <u>Compliance with Technical Standards</u>.

(a)   Subject to Part I – Section 4.1(b), the Customer agrees to comply with the relevant Intelsat Technical Standards applicable to each service that is the subject of a Novated Contract.  The relevant standards for each service referred to in Part I – Section 2.2 are listed in Part III – Section 5 of these Terms and Conditions.

4

(b)    The applicable Intelsat Technical Standards may be amended from time to time by the Company, subject to prior notification to and consultation with the Customer, provided that if such amendment would materially affect the Customer's use of a service which has already been activated at the time of such change or require the expenditure of capital by the Customer, the Company will only apply such amendment to the Customer's Novated Contracts if such amendment is critical to the operation of the Company's Space Segment. In such circumstances, the Company agrees to negotiate with the Customer in good faith to agree on actions to ameliorate any costs associated with any such amendment.

4.2    Earth Station Operation.

(a)    All facilities or services using the Company's Satellite Capacity must be connected or used in a manner which does not interfere with the effective operation of the Company's Space Segment or any of its components.

(b)    The Customer agrees to use only transmit earth stations duly authorized by the Company or INTELSAT to access the Company's Satellite Capacity. At the time of authorization, the Company will ensure that all liability, including but not limited to financial liability, for the operation of approved earth stations, is accepted by either the Customer or directly by the earth station operator.

(c)    A request for approval of an earth station to utilize the Company's Space Segment for the transmission of services shall be submitted to the Company by the Customer. If such earth station complies with the applicable Intelsat Technical Standards, the Company's approval shall not be unreasonably withheld or delayed.

4.3    Assurance of Compliance.

The Company reserves the right to monitor the radio frequency signals carried by the Company's Satellite Capacity to ensure that the Intelsat Technical Standards are met. The Company shall use reasonable efforts to ensure that such monitoring does not impair the quality of any services operated by the Customer utilizing the services provided hereunder.

4.4    Allocated Capacity.

Allocated Satellite Capacity may be used by the Customer for any service application, as long as operation of such Capacity is at all times in conformance with the approved use of the Satellite Capacity and the technical and operational conditions specified in the applicable Intelsat Technical Standards, and is approved by the Company.

5

Attachment 2, Part I

4.5    Scheduled Pre–Service Testing; No Commercial Traffic.

No commercial traffic may be placed on the Company's Space Segment during the scheduled pre–service testing period.

## 5.    APPLICABLE CHARGES AND PAYMENT TERMS

5.1    Charges.

Customer shall pay to the Company the charges applicable to each Novated Contract in accordance with the payment terms set forth in this Part I – Section 5 and in accordance with the rates set forth in Attachment 1 to the Novation Agreement or, if no such rate is set forth in Attachment 1 for a Novated Contract, the applicable rates set forth in the Novated Service Rate Schedule.

5.2    Provision of Adequate Security of Payment.

With respect to any Novated Contract for which collateral has been required prior to the date of execution of the Novation Agreement pursuant to INTELSAT's collateral terms and conditions applicable to such Novated Contract prior to the Closing Date, such collateral will continue to be required from and after the Closing Date. The form and amount of such required collateral shall be specified in Attachment 1 to the Novation Agreement. For the avoidance of doubt, if no collateral has been required prior to the date of execution of the Novation Agreement pursuant to INTELSAT's collateral terms and conditions with respect to a Novated Contract prior to the Closing Date, no amount is specified in Attachment 1 with respect to a Novated Contract; thus there is no collateral requirement in respect of such Novated Contract.

5.3    Billing and Payment.

(a)    Billing Cycles and Other Billing Terms.  The four billing cycles and related terms applicable to Novated Contracts are described below. With respect to a Novated Contract, the Customer will continue to be billed for such Novated Contract after the Closing Date in accordance with the billing cycle and related terms that applies to such Novated Contract as set forth in Attachment 1. Any and all transfer, currency exchange or similar fees are the responsibility of the Customer. Any late payments of amounts due will be charged interest of sixteen (16) percent per annum, provided that if an amount is being disputed in accordance with Part I – Section 5.3(b) hereof, no such interest will be charged other than in the circumstances set forth in such Section. The four billing cycles and their related terms are as follows:

6

(i)    Quarterly in Arrears.

Pursuant to the quarterly in arrears billing cycle, the Company bills quarterly in arrears, in U.S. dollars, in the month following the quarter of service, with the amount billed due for payment in U.S. dollars sixty (60) days after the invoice date.

(ii)    Monthly in Arrears.

Pursuant to the monthly in arrears billing cycle, the Company bills monthly in arrears, in U.S. dollars, in the month following the month of service, with the amount billed due for payment in U.S. dollars forty-five (45) days after the service month end.

(iii)    Quarterly in Advance.

Pursuant to the quarterly in advance billing cycle, the Company bills quarterly in advance, in U.S. dollars, in advance of the quarter of service, with the amount billed due for payment in U.S. dollars by the tenth (10th) day of the month preceding the quarter of service. No interest will be earned by the Customer on any prepayments.

(iv)    Monthly in Advance.

Pursuant to the monthly in advance billing cycle, the Company renders monthly bills in advance, in U.S. dollars, in advance of the month of service, with the amount billed due for payment in U.S. dollars prior to the commencement of the month of service. No interest will be earned by the Customer on any prepayments.

(b)    Invoice Disputes. The Customer shall notify the Company as soon as possible but no later than 45 days after the invoice date in the event of any dispute regarding the charges payable by the Customer to the Company. The Customer shall pay the undisputed amount of any invoice by the relevant payment due date. The Company and the Customer shall enter into discussions and shall use their best efforts, including reciprocal provision of relevant records, to resolve disputes within sixty (60) days from the relevant payment due date. In the event that, as a result of such discussions, it is determined that the Customer should pay any amount to the Company, the Customer shall pay interest to the Company in the amount of sixteen (16) percent per annum on any amounts paid after the payment due date notwithstanding initiation

7

of such discussions. Each party will bear its own costs in connection with any such dispute.

5.4    <u>Taxes</u>.

(a)    Except as provided in Part I – Section 5.4(b), the Customer agrees to pay all applicable withholding, excise, sales, value added, privilege, gross receipts, use, transfer and similar taxes, duties, imposts, levies, fees and assessments, including government and/or Customer "mark–up" on service(s) or similar liabilities however denominated, other than taxes of the jurisdiction under the laws of which the Company is organized or in which its principal office is located that are imposed on or measured by the Company's net income or any fees imposed by a government regulatory authority that is not a taxing authority ("Taxes"), that are or may be directly levied by any applicable government authority on account of the services provided or payments made under this Agreement on or after the Closing Date, and any amounts payable to the Company from the Customer hereunder shall be increased such that the net amount actually received by the Company from the Customer hereunder after giving effect to such Taxes will equal the amount the Company would have received hereunder had no Taxes been imposed.

(b)    During the original term of the applicable Novated Contract, provided that the Customer is in compliance with its obligations set forth in paragraph (c) below, any amount payable to the Company hereunder shall be reduced by the amount of any withholding taxes imposed on such amount by any taxing authority of any jurisdiction in which the Customer or an affiliate of the Customer is located or which otherwise has jurisdiction over the Customer with respect to any payments for or with respect to the services provided by the Company to the Customer hereunder; provided that to the extent that the Customer or an affiliate of the Customer is entitled to a refund of, or a credit against taxes imposed by the jurisdiction in which the Customer or an affiliate of the Customer is located for such withholding taxes, then no reduction shall be made pursuant to this Section 5.4(b).

(c)    The Customer will cooperate with the Company to reduce the amount of any withholding taxes imposed on amounts payable by the Customer or an affiliate to the Company including, without limitation, by making any elections or taking any actions available or permissible under any applicable tax treaty, tax law, or any International Telecommunications Union agreement, accord or initiative. If the Customer does not comply with its obligations set forth in this paragraph (c), it shall not be entitled to reduce any

8

amount payable by it to the Company pursuant to paragraph (b) above.

5.5    Payment Instructions.

(a)    For the purpose of providing invoices and making payments in connection with this Agreement, the details set forth in Schedule 1 to the Novation Agreement shall be used.

(b)    Such payments shall be deemed to be made by delivery of cash, check drawn on the Customer's business account, certified cashier's check, or bank wire transfer. All payments between the Customer and the Company pursuant to this Agreement shall be made in U.S. dollars or such other currency as the Company may agree to.

# 6.    SERVICE RESTORATION/PRIORITY OF SERVICES

6.1    Acknowledgement and Agreement.

The Customer acknowledges and agrees to the principles for services set forth in this Part I – Section 6 which shall be deemed applicable to all Novated Contracts.

6.2    Purpose.

Restoration procedures are based on the Company's priority list, which serves two purposes in cases of Space Segment malfunction: (a) the order in which services on the malfunctioning capacity would be restored, and (b) the order in which services on healthy Satellites would be preempted. In the case of a partial or total Satellite failure, reallocation of a service by the Company, at its own discretion, from one Company facility to another, is not considered to be preemption, provided that the alternative capacity provides at least equal performance to the required coverage area, but shall be considered an assignment governed by Part I – Section 8.2.

6.3    Priority List.

(a)    The priority list consists of four categories ranging from the most protected services (i.e., most likely to be restored and least likely to be preempted) to the least protected services. The four categories are as follows:

(i)    non-preemptible international services (public switched network ("PSN") carrier services followed by non-preemptible leases);

(ii)    non-preemptible domestic services;

9

Attachment 2, Part I

(iii)    preemptible international services; and

(iv)    preemptible domestic services.

(b)    For the purposes of applying this priority list, (i) "international services" shall be deemed to mean the following: (A) international public telecommunications services between or among territories under the ultimate jurisdiction of two or more government authorities; (B) domestic public telecommunications services between areas separated by areas not under the same ultimate jurisdiction as the applicable customer, or between areas separated by the high seas; and (C) domestic public telecommunications services between areas which are not linked by any terrestrial wideband facilities and which are separated by natural barriers of such an exceptional nature that they impede the viable establishment of terrestrial wideband facilities between such areas; and (ii) "domestic services" shall be deemed to mean the following: domestic public telecommunications services in territories under the ultimate jurisdiction of one government authority. Notwithstanding the foregoing, services will be treated as "international" unless the Company is notified by the Customer that they are used solely for domestic applications and such services fall within the definition of "domestic services" set forth above.

The Company's services may be used for international or domestic applications, or for a combination of international and domestic applications, subject to the applicable Intelsat Technical Standards.

(c)    Within each of the four categories specified in paragraph (a), PSN carrier services are given priority and the remaining services, in each category, are given priority chronologically, with the oldest start of service date having the highest priority and the most recent start of service date having the lowest.

6.4    Reassignment.

In the event that a space segment malfunction is of such a scale that all preemptible leases have been preempted and additional services need to be preempted, then it would be necessary to remove non-preemptible services by reference to the Company's priority list. Consistent with the deployment plans listed in Part III to these Terms and Conditions and effective upon the arrival of the INTELSAT IX system spare at 332.5° E, non-preemptible leases on a non-failed satellite will not be preempted to restore higher priority services. In the event of an in-orbit space segment malfunction and in accordance with preemption procedures which permit service to be preempted from a non-failed spacecraft to restore services

10

from the spacecraft where the malfunction occurred, preemption procedures would require either:

(a) reassigning the services from the orbital location where the malfunction occurred to the orbital location(s) of the restoration spacecraft, or

(b) the redeployment of a restoration spacecraft to the orbital location where the malfunction occurred, either upon arrival of a replacement spare spacecraft or immediately after the loss of the spacecraft at the failed orbital location.

In the case of satellite malfunction, practical circumstances of geography and beam coverages will be taken into account by the Company in implementing the foregoing procedures.

7. **APPLICABLE LICENSES**

7.1 <u>Customer Obligations and Right to Terminate</u>.

(a) The Customer shall comply with all applicable regulatory and licensing requirements promulgated by the applicable domestic authority. As a condition of using the services provided by the Company under any Novated Contract, the Customer shall obtain licenses and approvals necessary to operate Customer's services with the Company's Space Segment, including those governmental authorizations, licenses, and approvals required at the Closing Date by reason of the Company providing Services pursuant to the Novation Agreement and required as a result of the Privatization ("New Authorizations").

(b) If any such New Authorizations have not been obtained by the Customer at the Closing Date, the Customer will continue to use its best efforts to obtain such authorizations promptly following the Closing Date, and shall undertake any measures in connection therewith reasonably requested by the Company in good faith.

If, notwithstanding such efforts, the New Authorizations are not obtained by the ninetieth day following the Closing Date, or if, prior to the expiration of such 90 day period, a final, non-appealable decision is rendered by the applicable government authority denying such New Authorization, the Customer may terminate those Novated Contracts to which such New Authorizations relate by giving 30 days written notice to the Company of such termination, without penalty except as set forth in paragraph (d) below.

11

Attachment 2, Part I

(c)    If any governmental action (whether in its sovereign or contractual capacity) of any government authority of any jurisdiction other than the jurisdiction under the laws of which the Customer is organized or in which its principal office is located, reasonably beyond the control of the Customer, is taken or will be taken which prevents the Customer from receiving the services provided under any Novated Contract, the Customer shall notify the Company of such action promptly after such action has been taken or when the Customer has knowledge that such action will be taken, if earlier. The Customer shall use its best efforts to cause any action to be taken which would permit the Customer to receive such services and shall undertake any measures in connection therewith reasonably requested by the Company in good faith.

If, notwithstanding such efforts, the Customer is still prevented from receiving such services on the date ninety (90) days following the date such government action is taken, or if, prior to the expiration of such 90 day period, a final, non-appealable decision is rendered by the applicable government authority preventing the Customer from receiving such services, the Customer shall have the right to terminate those Novated Contracts affected without penalty, except as set forth in paragraph (d) below.

(d)    If the Customer terminates Novated Contracts in accordance with paragraph (b) or (c) above, the following will apply:

(i)    The Company will calculate the NPV in U.S. Dollars of all terminated Novated Contracts on the date of such termination (the "Terminated NPV"). The "net present value" or "NPV" as of any determination date means the aggregate of the future payments for service charges to be made in respect of the applicable Novated Contract, each discounted from its scheduled due date to present value on such determination date using a rate of 14% per annum, compounded quarterly. For purposes of the preceding definition, the scheduled due date for payments of service charges will be determined assuming that such charges are billed on a quarterly in arrears billing cycle. For preemptible services, the future payments to be made for such services will be deemed, for the purposes of the NPV calculation, to be limited to the applicable cancellation charge.

(ii)    During the twelve month period following the termination date of the terminated Novated Contracts, the Customer agrees to undertake commitments to the Company to order new services with an NPV (calculated in U.S. Dollars on

12                                      Attachment 2, Part I

the date such new services are ordered) up to the value of the Termination NPV in clause (i).

(iii) During the twelve month period following the termination date of the terminated Novated Contracts, in parallel to the Customer's actions in (ii), the Company will use all reasonable endeavors to resell the capacity that had been allocated for the provision of the services pursuant to the terminated Novated Contracts.

(iv) The termination NPV will be reduced during the twelve month period by the total NPV of all new contracts entered into pursuant to clause (ii) and (iii) above, calculated in U.S. Dollars on the date each such new contract is entered into.

(v) On the first anniversary of the termination date of the terminated Novated Contracts, any balance of the Termination NPV remaining will be calculated by the Company and notified to the Customer. The Customer has 30 days following such notification to pay 50% of the balance of the Termination NPV in full and final settlement of all liabilities with respect to the terminated Novated Contracts or to order new services with an NPV (calculated in U.S. Dollars on the date such new services are ordered) equal to 100% of such balance.

(e) For purposes of this Part I – Section 7.1, "best efforts" shall mean diligently and in a timely manner making all applications, submissions, filings and other submissions necessary or appropriate in connection with obtaining the applicable government authorization and making all appeals permissible in connection therewith, promptly and comprehensively responding to any inquiries or requests and otherwise cooperating with, any government authority relating to the applicable government authorization, approaching any government authority and requesting that actions be taken in order for such government authorization to be issued and paying any fees imposed by any government authority in connection with obtaining such government authorization.

7.2    Company Obligations.

The Company agrees to procure and maintain all licenses, approvals and government authorizations required to be obtained by the Company in order to provide the Satellite Capacity via the Space Segment and related services to the Customer hereunder and to comply with all statutes, by-

13

laws, regulations and requirements of any government or other competent authority applicable to the Company.

## 8. SERVICE INTERRUPTION/OUTAGE CREDITS; ASSIGNMENT OF ALTERNATIVE CAPACITY

### 8.1 Reassignment.

In the event of either failure or significant degradation of service that is not caused by the Customer, the Company will exercise its best efforts to reassign the Customer to equivalent alternative capacity. In certain circumstances set forth in Part II of these Terms and Conditions, the Company shall provide outage credits for certain service interruptions.

### 8.2 Assignment of Alternative Capacity.

Except as specifically set forth in Part II of these Terms and Conditions, the Company may not assign new or alternative Satellite Capacity for a particular service provided pursuant to a Novated Contract without the prior consent of the Customer, which consent shall not be unreasonably withheld or delayed.

## 9. MOST FAVORED CUSTOMER (MFC)

### 9.1 Applicability of MFC.

(a)    The Customer's Novated Contracts as set forth in Attachment 1 shall be eligible for Most Favored Customer ("MFC") rates and terms and conditions as set forth herein.

(b)    MFC protection shall entitle the Customer to protection that the rates charged by the Company on the Novated Contracts continue to be charged by the Company at a rate that is no greater than the lowest rate that the Company charges (after giving effect to any discounts or rebates other than those specified in Part I – Sections 9.3 (c) and (d)) or any Post-Privatization Service Order ("most-favored-customer rates") for Satellite Capacity having the same or comparable of the following like-term parameters, each as described further below:

(i)    Technical Parameters:

(A)    orbital location / spacecraft;
(B)    connectivity;
(C)    power;
(D)    bandwidth; and
(E)    service type; and

14

Attachment 2, Part I

(ii)  Commercial Parameters:

(A)  service commitment duration;
(B)  preemptibility;
(C)  advance reservation commitment status; and
(D)  demand.

(c)  For purposes of this Part I – Section 9.1:

(i)  "Orbital location/spacecraft" refers to the applicable spacecraft and its equatorial slot (defined in degrees of East longitude) through which a particular service is provided. The "same or comparable" orbital location/spacecraft will be deemed to be used for two services if both services are provided using:

(A)  Company spacecraft at the same orbital location;

(B)  Company spacecraft which are co–located at the same orbital location; or

(C)  two "identical" spacecraft (e.g., 2x generic IS–IXs) located within 2 degrees of each other.

(ii)  "Connectivity" refers to the uplink and downlink beam combination used on a satellite to provide a particular service. Beams on Intelsat satellites (Series VI, VII, VIIA, VIII, VIIIA, IX, X) and APR-1 and -2 leased capacities are defined below:

(A)  C–Band: Wide Beam (WB), Zone Beam (ZB), East Zone (EZ), West Zone (WZ), East Hemi (EH), West Hemi (WH), Hemi A (HA), Hemi B (HB), North West Zone (NWZ), North East Zone (NEZ), South West Zone (SWZ), South East Zone (SEZ), Mid–West Zone (MWZ), Global (G) and C–Spot (CS).

(B)  Ku–Band: East Spot (ES), West Spot (WS), Spot 1 (S1), Spot 2 (S2), and Spot 3 (S3).

The "same or comparable" connectivity will be deemed to be used for two services if the connectivities used to provide such services are identical.

(iii)  "Power" refers to the equivalent isotropically radiated power of the transponder.  The "same or comparable" power will be deemed to be used for two services if such

15

Attachment 2, Part I

power is categorized for billing purposes as "standard" for both services or is categorized as "premium" for both services in the Novated Service Rate Schedule.

(iv)   "Bandwidth", for lease services, refers to the power equivalent bandwidth used on a transponder or transponders to provide the applicable service. "Bandwidth", for purposes of channel and carrier services, refers to the amount of bandwidth and associated power based on the receive earth station type, bit rate and the forward error correction coding being used for such service. The "same or comparable" bandwidth will be deemed to be used by two services if the applicable increments of bandwidth are identical or are in the same category (or "tier") of bandwidth used for tariffing purposes under these Terms and Conditions and set forth in the Novated Service Rate Schedule.

(v)    "Service types" refer to the category designations for various service applications referred to in the List of Intelsat Technical Standards set forth in Part III – Section 5 to these Terms and Conditions. Two services will be deemed to be of the "same or comparable" service type if their service types are identical.

(vi)   "Service commitment duration" refers to the length of term of a customer's commitment to utilize a particular service. Two services will be deemed to have the "same or comparable" service commitment durations if they fall within the same category (or "tier") of commitment duration for tariffing purposes under these Terms and Conditions and set forth in the Novated Service Rate Schedule.

(vii)  "Preemptibility" refers to the priority given to a particular lease service in the event that lease services must be preempted. Two services will be deemed to have the "same or comparable" preemptibility status if they are in the same category of preemption, i.e. either they are both "preemptible" or both "non-preemptible".

(viii) "Advance reservation commitment status" refers to whether a service is entitled to the discount offered to a reservation with a start date that coincides with the operational availability of a satellite at a specific orbital location. Such discounts do not apply to Contracts that commence service at a point after the date of operational availability. Two

16

Attachment 2, Part I

services will be deemed to have the "same or comparable" advance reservation commitment status if the two services either both commence on the first day of operational availability of the applicable satellite or (ii) both commence on other dates.

(ix)    "Demand" refers to (A) whether a particular transponder capacity meets the criteria for "unused transponder capacity" in Part II – A – Section 7 "Service Rates Applicable to Lease Services – Incentives for Unused Transponder Capacity" and (B) whether, in the process of building new communities, the utilization of capacity by the applicable customer enables the Company to charge higher rates with respect to subsequent orders for capacity on the same connectivity and the applicable service order by such customer is sizeable (i.e. it utilizes capacity at least equivalent to the bandwidth on a full transponder) (a customer with such enabling ability is referred to herein as an "anchor tenant"). Two services will be deemed to have the "same or comparable" demand if (A) the applicable capacity used to provide the two services either both meet the criteria for "unused transponder capacity" as described above or both do not meet the criteria for "unused transponder capacity" and (B) the applicable customers are either both "anchor tenants" as described above or both do not fall within the definition of "anchor tenant". The Company agrees that any discount or rebate granted to a customer based on Demand shall be recorded in an auditable manner.

(d)    Subject to Part I – Section 12.2, in the event that the Company charges a rate for a Post-Privatization Service Order that is lower than the rate charged to the Customer for a Like Contract, such Customer shall be entitled to the MFC rates on like terms, provided that such Customer also agrees that the other terms and conditions applicable to such Post-Privatization Service Order which are, in the good faith determination of the Company, material to its price ("Other Applicable Terms") shall also apply to such Like Contract (referred to herein as a "Like-terms Offer"). The acceptance by the Customer of such Other Applicable Terms shall not result in the loss of the protections provided by the MFC provisions. Upon such election and agreement, the Terms and Conditions applicable to such Like Contract shall be deemed to be amended by such Other Applicable Terms with effect as of the next following billing cycle.

17

Attachment 2, Part I

9.2     Term of MFC.

The term (the "Term") of the MFC provision shall not exceed the lesser of (i) five (5) years after the Closing Date, or (ii) the end of the specified term of the Customer's Novated Contract, including any extension or amendment of the term of such Novated Contract in accordance with these Terms and Conditions. The protections provided by the MFC provisions may be exercised an unlimited number of times during the Term in accordance with the provisions hereof. Except as set forth in the following sentence, if the Terms and Conditions applicable to any Novated Contract are amended, including pursuant to a "migration" pursuant to Section 4 of the Novation Agreement, then the MFC provisions shall immediately expire with respect to such Contracts. Notwithstanding the preceding sentence:

(A)     any amendments to the Terms and Conditions pursuant to Part I – Section 9.1 (d);

(B)     any change made to an Allotment (as defined in Part II – B – Section 2) associated with a Channel or Carrier Service Commitment (each as defined in Part II – B) covered by a Novated Contract;

(C)     any conversion of service pursuant to Section 10;

(D)     any amendment (including one–time extensions of leases) pursuant to Part II – A– Section 2.6;

(E)     any remapping of any Channel or Carrier Service pursuant to Part II – B – Section 2.4(f); and

(F)     any other type of amendment which is specifically contemplated by, and for which provisions have been specifically set forth in, Part II of these Terms and Conditions,

shall not terminate the MFC protections which would otherwise apply to such service hereunder.

9.3     Limitations on the Application of the MFC Protection

Notwithstanding the foregoing, the Company shall not be obligated to provide MFC protection to the Customer's Novated Contracts in the following circumstances (regardless of whether the like-term parameters of any such Contract and any Post-Privatization Service Order are satisfied):

18                                          Attachment 2, Part I

(a)    <u>Materiality</u>.  Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall only be entitled to MFC protection if the annual service charge with respect to the applicable Like Contract is five percent or more higher than the annual service charge with respect to the applicable Post-Privatization Service Order.  For the avoidance of doubt, if a Contract is not entitled to MFC protection with respect to a Post-Privatization Service Order because of the application of this Part I – Section 9.3(a), such Contract may still be entitled to MFC protection with respect to any subsequent Post-Privatization Service Order in accordance with the terms and provisions of this Part I – Section 9.

(b)    [Intentionally Omitted.]

(c)    <u>Competitive Response Offer</u>.

(i)    Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall not be entitled to MFC protection with respect to rates charged by the Company to other customers pursuant to any Competitive Response Offer (as defined below) the Company may choose to make.

(ii)    A "Competitive Response Offer" is an offer by the Company to provide service to a customer on terms that meet those being offered to such customer by a satellite capacity provider which is a competitor to the Company and that satisfies the following additional requirements:

(A)    Such Competitive Response Offer is being made to a customer who has provided documented or other auditable evidence to the Company, to the satisfaction of the Company, that such customer is in receipt of a bona fide and time–sensitive offer from a competitor of the Company that will expire within ninety (90) calendar days from the date first made for service substantially similar to the service being provided to such customer by the Company, and such competitor is offering a rate that is at least ten (10) percent lower than the rate that the Company is charging; and

(B)    the service provided by the Company to such other customer which is the subject of the Competitive Response Offer utilizes at least 18 MHz of capacity.

Attachment 2, Part I

(d)  <u>Co–Marketing Agreements</u>.  Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall not be entitled to MFC protection if the Company offers non-discriminatory co–marketing agreements, that may include targeted promotional discount incentives or other tailored service terms and conditions offered to another customer as part of a joint marketing or promotional program between the Company and such other customer, pursuant to which such customer is required to pay a fee or provide other consideration for participation in such program.

(e)  <u>Compliance with Applicable Law</u>.  Notwithstanding the MFC provisions of this Part I – Section 9, the Customer shall not be entitled to the MFC protection if, in offering any such protection, the Company would be in breach of any applicable laws or regulations.

9.4  <u>Remedies</u>:  The Company's compliance with its MFC obligations shall be verified as follows:

(a)  <u>Internal Review</u>.

(i)  <u>Timing</u>:  The Company will conduct an internal MFC review on an annual basis.

(ii)  <u>Officer's Certificate</u>:  Within 30 days of the completion of the Company's annual external audit of the Company's financial statements, the Chief Financial Officer of the Company will issue a Certificate, a copy of which shall be provided to the Customer upon its written request, certifying that, based on the Company's internal MFC review, the Company is in material compliance with respect to the application of the MFC provisions to the Novated Contracts.

(b)  <u>External Audit</u>.

(i)  <u>Timing</u>:  The Company will select an external auditing firm to perform an annual MFC audit (the "Auditor").  The first such audit will commence after the first annual anniversary of the Closing Date and will cover MFC-related activity during the first year after Privatization.  Subsequent annual external audits will cover subsequent years' activities.  The final audits for any Novated Contract will occur after the termination of the MFC Term applicable to such Novated Contract.

Attachment 2, Part I

(ii)  <u>Audit Costs</u>:  The Company is solely responsible for the Auditor's fees, except in the circumstances described in paragraph (vii) below.

(iii)  <u>Purpose</u>:  The Auditor will perform an audit solely for the purpose of verifying whether the Company has properly discharged its MFC obligations.

(iv)  <u>Procedures</u>:  The audit shall be undertaken at the Company's offices during normal business hours at times acceptable to the Company and shall be conducted in such a way so as to minimize disruptions to the Company's day-to-day activities.

(v)  <u>Confidentiality</u>:  The Auditor shall agree to be bound by a written obligation of confidentiality in favor of the Company that is acceptable to the Company.  The Auditor must be obligated in all circumstances not to disclose to parties other than the Company any information revealed during the audit and to limit its report as specified in clause (vi) below.

(vi)  <u>Auditor's Report</u>:  The Auditor is solely permitted to report its findings in a written report to the Company which will state the results of their review using Agreed-Upon procedures substantially similar to the procedures set forth in Annex 4 to the Terms and Conditions as to the Company's compliance with the MFC provisions with respect to Novated Contract(s).  The Auditor's report shall not contain any confidential information relating to the Company or any of its customers.  The Company shall promptly provide a copy of such Auditor's report to the Customer upon the Customer's written request, together with a list of the service order numbers of the Contracts reviewed in such audit.

(vii)  <u>Customer Request for Second Stage Audit</u>:  Within 30 days after issuance of the Auditor's report pursuant to paragraph (vi), the Customer may request that a second stage of the external audit be conducted by the Auditor with respect to all or a portion of the Customer's Novated Contracts, <u>provided</u> that such Contracts were not covered by the initial audit conducted with respect to such audit year.  Such Customer's request for a second stage audit shall be in writing.

21

Attachment 2, Part I

One second stage audit shall be conducted in accordance with the provisions of this Part I – Section 9, promptly after the expiration of the 30 day period following the issuance of the Auditor's report, with respect to the applicable Contracts of all customers requesting such second stage audit, if any.

The Auditor shall report its findings in a second written report to the Company which will state the results of their review using the Agreed-Upon procedures referred to above as to the Company's compliance with the MFC provisions with respect to such Contracts. The second Auditor's report shall not contain any confidential information relating to the Company or any of its customers. The Company shall promptly provide a copy of such second Auditor's report to each customer that has requested such second stage audit.

If pursuant to such second stage audit the Company is found to be in material compliance with its MFC obligations with respect to the applicable Contracts, the Customer shall pay its portion of the expenses of such audit, based on the number of Contracts reviewed by the Auditor at the Customer's request. If pursuant to such second stage audit, the Company is found not to be in material compliance with its MFC obligations with respect to the applicable Contracts, the Customer shall not have to pay for the expenses of such second stage audit.

(c)   Binding Result:  If an external audit under Part I – Section 9.4 (b) (vii) determines that the Company is in material compliance with its MFC obligations under this Agreement, such determination will be final and binding.

(d)   Remedy for Failure to Comply with MFC:  If the Company is found not to be in material compliance with its MFC obligations under this Part I – Section 9, either pursuant to an external or internal audit, the Company shall offer the Customer modifications to the applicable Novated Contract(s) that cause the Company to come into material compliance with this Agreement, such offering to be made in accordance with paragraph (e). If the Customer accepts such offer, the Company shall credit any applicable overcharge to the Customer's payment obligations under the applicable Novated Contract(s), together with interest on such amount of overcharge, calculated as set forth below, plus an additional amount equal to 20% of the sum of the amount of such overcharge plus interest. Any applicable credit due to the

22

Attachment 2, Part I

Customer will be calculated based on the date that the Customer would have received the benefit of the modified contract price had the Company's non-compliance with the MFC provisions not occurred, provided that, unless such non-compliance was determined pursuant to a second stage audit, the retroactive effect of such credits will be limited to the beginning of the year under audit. Interest shall be calculated on such credit amount as if such amount was borrowed by the Company on the applicable date(s) the Customer would have received the benefit of the modified contract price, and was repaid on the date such credit is made and bore interest at the London Interbank Offered Rate for overnight funds denominated in U.S. dollars in effect during such period.

This Part I – Section 9.4 shall be the Customer's sole remedy in the event that the Company fails to comply with its MFC obligations under this Part I – Section 9. In no event shall the Company's failure to comply with Part I – Section 9.4(d) entitle the Customer to terminate the underlying Novated Contracts.

(e) <u>Notice</u>: If an audit (internal or external) determines that the Company did not offer a Like-Terms Offer in accordance with this Part I – Section 9, the Company shall notify the Customer of its Like-Terms Offer no later than 45 days after such determination, in the case of an internal review, or 45 days after the issuance of the Auditor's report, in the case of an external audit. Within 45 calendar days after the Company has sent its Like-terms Offer, the Customer shall notify the Company in writing if it accepts the Like-Terms Offer. If the Customer accepts such offer, the Company will effect the adjustments to the applicable Novated Contracts and any applicable credit in accordance with paragraph (d) within 45 days after the Company has received the Customer's acceptance of the offer. If the Customer does not provide the Company with a written response within 45 calendar days after the Company has sent its Like-Terms Offer, the offer will lapse and the Company will have no further obligation to the Customer with respect to the audit findings.

9.5 <u>LCO</u>.

Novated Contracts which are LCO Service Contracts as identified in Attachment 3 to the Novation Agreement are not eligible for the MFC provisions in this Novation Agreement; all other Novated Contracts are eligible for such MFC provisions.

Attachment 2, Part I

**10.    CONVERSION OF SERVICES**

10.1   <u>Facilitation of Transitioning to a Full Circuit/Service Basis</u>.

(a)     If the Customer desires to amend any Novated Contract hereunder that was undertaken on a half-circuit basis to a full circuit/service basis, the Company agrees to use its best efforts to facilitate the orderly transitioning of the services provided under such Contract.

(b)     The efforts of the Company to facilitate such an orderly transition will be undertaken in accordance with three basic principles:

(i)     all half-circuit transitions are optional and must be voluntarily initiated by the party responsible for the identified commitments related to the identified half-circuits;

(ii)    all half-circuit transitions are subject to the agreement of all involved participants, including the correspondents for the applicable service; and

(iii)   the full financial value to the Company of the commitments associated with the circuits being transitioned must be preserved.

(c)     The Company agrees to identify and undertake a range of appropriate mechanisms for facilitating this orderly transition. The mechanism for achieving the goal of an orderly transition for a given service or set of services would be subject to the agreement of all parties involved in any given transaction. The mechanisms will include as appropriate, among others, the following:

(i)     transfer to a "self-matching" or single circuit/service basis for a given set of services and related commitments;

(ii)    assistance with "swapping" or "matching" of existing half-circuits;

(iii)   reasonable efforts to identify service providers, including existing and new customers, interested in the transition of half-circuit services; and

(iv)    contractual arrangements for the assignment, transfer or novation of existing half-circuit services among customers and the Company on the terms and conditions agreed among the applicable participants.

Attachment 2, Part I

10.2   Leases.

(a)   For lease services with multiple Participants (as defined in Part II – A), the Company would undertake, in accordance with the principles set forth in Part I – Section 10.1(b), to assist customers, at their request, with the transition to a single customer/lease service utilizing the mechanisms available within these Terms and Conditions for lease services, i.e., the ability of Committing Participants (as defined in Part II – A) to advise the Company of their mutual agreement regarding their respective shares of a given lease and the Company's related ability to release Participants from their existing commitment obligation when such an action is deemed to be in the interests of the Company's system.

(b)   If, in order to facilitate an orderly transition of lease services, the Committing Participants voluntarily reached agreement pertaining to such a release, the Company would agree not to unreasonably withhold or delay its agreement to such a release.

## 11.   INTELLECTUAL PROPERTY

### 11.1   Intelsat Intellectual Property.

The Company represents and warrants that it has the right to use the Intelsat Technical Standards including the patents, trade secrets and copyrights embodied therein (but excluding any trademarks, servicemarks or tradenames) (collectively referred to as the "Company Intellectual Property").

### 11.2   License to Intelsat Intellectual Property.

The Company hereby grants the Customer the non–exclusive right to use the Company Intellectual Property solely to the extent reasonably necessary in order to use the services provided pursuant to the Novated Contracts in accordance with the Terms and Conditions. The license granted herein shall include the Customer's right to sublicense to any entities with which the Customer has contracted for down-stream use of services provided under Novated Contracts ("Relevant Entities") the right to use such Company Intellectual Property solely to the extent reasonably necessary for such Relevant Entity to use such services in accordance with the Terms and Conditions. Any such sublicense shall be no greater in scope than the license granted herein. The license granted by this Section 11.2 is contingent on the Customer (including the Relevant Entities) protecting the Company's rights in the Company Intellectual Property, including monitoring and enforcing the terms of use on the Relevant Entities. Without limitation of the Customer's obligations under Part I – Section 7.1(a), the Customer agrees to comply with all applicable

export and re-export laws and regulations in connection with the transfer, delivery or disclosure of any of the Company Intellectual Property. Except for the limited rights granted by this Part I – Section 11, all rights to the Intelsat Technical Standards shall remain the property of the Company; the Customer will not have, and shall not provide to the Relevant Entities, any other right of use unless otherwise expressly mutually agreed by the Company and the Customer in writing signed by duly authorized representatives of each such Party.

11.3   Remedies.

Without limiting of any other remedies available hereunder or otherwise available under applicable law, in the event the Customer breaches the provisions of this Part I – Section 11, the Company shall be entitled to seek equitable (including injunctive) relief relating to such breach in any court having jurisdiction over the parties.

## 12.   TERMINATION OR SUSPENSION OF SERVICE

12.1   Termination or Suspension by the Company for Cause.

(a)   Subject to Part I – Section 12.3 below, the Company reserves the right to terminate or suspend any services provided to Customer under any applicable Novated Contract for cause due to the Customer's breach of the material terms of this Agreement in respect of such Novated Contract, including, but not limited to, Customer's non-payment of amounts due hereunder and/or Customer's non-compliance with applicable Intelsat Technical Standards, if (i) the Company has provided the Customer with notice of such breach and the Customer has not within the thirty (30) day period following the date the Company has given such notice cured such breach to the Company's satisfaction or (ii) in the case of non-payment of charges for services, if such charges are (A) sixty (60) days past due, in the case of services billed on a quarterly in arrears billing cycle, (B) forty-five (45) days past due, in the case of services billed on a monthly in arrears billing cycle, and (C) five (5) days, past due, in the case of services billed on a quarterly or monthly in advance billing cycle; provided that such time period shall not begin to run if an amount is being disputed in accordance with Part I – Section 5.3(b) hereof until the earlier of the settlement of such dispute or the expiration of the sixty–day period referred to in such Section. For purposes of this Part I – Section 12.1(b), "NPV" shall be calculated as set forth in Part II – A – Section 2.6(a).

(b)   Subject to the limitations set forth further below in this paragraph (b), in the event of a breach of this Agreement by the Customer

relating to non-payment of charges for services, the Company shall be entitled to terminate or suspend some or all of the Customer's Novated Contracts pursuant hereto. The maximum number of Novated Contracts which may be terminated or suspended by the Company for non-payment shall be limited by reference to the amount past due from the Customer expressed as a percentage of the total amount that was due from the Customer during the applicable billing period (the "Default Percentage"), as set forth below. The Company shall terminate Novated Contracts in the following order: terminate the Customer's Novated Contract with the most recent start of service date until the sum of the NPV of such terminated Novated Contracts divided by the NPV of all the Customer's Novated Contracts equals or approximates the Default Percentage. In the event that any amount remains past due on a date more than six months after the due date applicable to such amount, the Company may terminate or suspend Novated Contracts representing up to 100% of the NPV of all of the Customer's Novated Contracts as of such date, terminating the Novated Contract with the most recent start of service date prior to terminating any other Novated Contract. In the event of any other breach of this Agreement by the Customer, which has not been cured after the period specified in paragraph (a) above, the Company shall be entitled to terminate or suspend the applicable Novated Contract to which such breach relates. Any notice of termination or suspension shall state the Novated Contract(s) being terminated or suspended, the effective date of termination or suspension and the circumstances giving rise to termination or suspension. For purposes of this Part I – Section 12.1(b), "NPV" shall be calculated as set forth in Part II – A – Section 2.6(a).

(c)     In the event of any suspension by the Company of service under any Novated Contract pursuant to Part I – Section 12.1(b), (i) the Company may, after the applicable default has been cured, reinstate the applicable service, provided that the Company provides no assurances regarding the Company's ability to reinstate Satellite Capacity to the Customer if the applicable account is subsequently made current, and (ii) during the period which any such service is so suspended, the Customer shall not be entitled to the MFC protections under Part I – Section 9 hereof with respect to any of its Novated Contracts.

(d)     In the event of any termination by the Company of any Novated Contract pursuant to Part I – Section 12.1(b), the Customer will be liable for the entire balance that would have been due under the scheduled duration of the Novated Contract, except in the case of preemptible lease service, in which case the

Attachment 2, Part I

applicable cancellation charges shall apply as set forth in Part II – A – Section 4.5.

(e)     The Company shall not be obligated to activate new service for the Customer if the Customer has unpaid balances for charges that are (A) more than thirty (30) days past due, in the case of services billed on a quarterly or monthly in arrears billing cycle, (B) unpaid after the applicable due date, in the case of services billed on a quarterly in advance billing cycle, and (C) more than five (5) days past due, in the case of services billed on a monthly in advance billing cycle.

12.2   Retention of Funds.

The Company may, at its discretion, retain deposits or other sums paid by the Customer and apply such amounts to compensate for any damages caused to the Company by the breach (other than damages which the Company is not entitled to claim pursuant to Part I – Section 13). Any retention of Customer's funds shall not preclude the Company from making additional claims for compensation or from receiving such other damages that may be available at law or equity.

12.3   Default Under Multiple Customer Novated Contracts.

Provided that the Company has provided the Customer with notice and the right to cure as provided in Part I – Section 12.1, prior to any termination of a Novated Contract for non-payment pursuant to Part I – Section 12.1, the Company shall notify the defaulting Customer's correspondent(s) on such Novated Contract, if any, including, in the case of lease services, any other applicable Committing Participants (as defined in Part II – A) with respect to such Novated Contract, of such default. Following such notice, any of the applicable correspondents shall have the right to cure such default within fifteen (15) days of receipt of such notice. If the applicable correspondent(s) do so cure such default within such fifteen (15) day period and agree to assume the full liability for the balance of all payments due under such Novated Contract, the Company shall be deemed to accept the assignment of the defaulting Customer's Novated Contract to the applicable correspondent(s). If such assignment occurs as a result of a default, the defaulting Customer also shall be deemed to have agreed to such assignment and all rights of the defaulting Customer under such Novated Contract shall be terminated at the time of the assignment of the Novated Contract to the correspondent(s) who cured the default.

Attachment 2, Part I

## 13.   LIMITATION OF LIABILITY

### 13.1   No Liability.

Except as otherwise provided in Part I – Section 8 ("Service Interruption/Outage Credits; Assignment of Alternative Capacity") above, the Company shall not be liable for, and Customer shall hold the Company harmless from, any claim asserted by or any loss, damage, liability or expense sustained by any person or entity by reason of an interruption in the availability of the allotted capacity, regardless of the cause of the interruption.

### 13.2   Indemnity.

The Customer shall indemnify and hold the Company harmless from any loss, damage, liability or expense including all costs and expenses paid or incurred in disputing and/or defending against any of the following:

(a)   Libel, slander, invasion of privacy, or infringement of copyright arising from the use by the Customer or its customers of the allotted capacity;

(b)   Infringements of patents arising from (i) combining with, or using in connection with the allotted capacity, apparatus and systems of a Customer, its users, customers, contractors, lessees or assignees; or (ii) use by the Customer or its users, customers, contractors, lessees or assignees of the allotted capacity in a manner not contemplated by the Company and over which the Company exercises no control; and

(c)   Any act or omission of the Customer, its users, customers, contractors, lessees, agents, assignees, or employees in connection with the use of allotted capacity.

### 13.3   No Liability for Indirect Damages.

IN NO EVENT SHALL EITHER THE COMPANY OR THE CUSTOMER BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR UNDER THIS AGREEMENT WHETHER UNDER CONTRACT, WARRANTY, OR TORT OR OTHERWISE, INCLUDING LOSS OF REVENUE OR PROFITS, REGARDLESS OF THE FORESEEABILITY OF SUCH DAMAGES. Nothing in this Agreement shall exclude or limit the liability of the Customer or the Company for death or personal injury resulting from such party's own negligence in any jurisdiction where, as a matter of law, such liability cannot be excluded or limited.

Attachment 2, Part I

14. ASSIGNMENT

Neither this Agreement, nor any of the rights, duties, or obligations of the Customer or the Company hereunder may be assigned or delegated by the Customer or the Company without the prior written consent of the Company or the Customer, as the case may be (which consent shall not be unreasonably withheld or delayed), provided that no such consent shall be required for any such assignment or delegation to an entity that, as a result of a merger, consolidation, corporate reorganization or other similar transaction becomes a legal successor in interest to the Company or the Customer, as the case may be. If consent is required pursuant to the preceding sentence, any attempted assignment or delegation without such consent shall be void and without effect. The foregoing shall not be construed to prohibit the Customer from using its allotted capacity under any Novated Contract to provide service to third parties, subject to the terms of this Agreement.

15. CONFIDENTIALITY

15.1 Confidentiality Obligation

The Company and the Customer hereby agree that it may be necessary to the performance of this Agreement for either the Company or the Customer (the "Disclosing Party") to disclose to the other (the "Receiving Party") certain information that the Disclosing Party deems to be confidential and proprietary. The Receiving Party shall maintain the security and confidentiality of all Confidential Information (as defined below) received from the Disclosing Party hereunder, except:

(a) as part of its normal reporting or review procedure to regulatory agencies, its parent company, its auditors and its attorneys; provided that the party making such disclosure to any such regulatory agency shall seek confidential treatment of such information to the extent possible; and, provided, further, that any other third party to whom disclosure is made agrees to the confidential treatment of such information;

(b) in order to enforce its rights and perform its obligations pursuant to this Agreement;

(c) to the extent necessary to obtain appropriate insurance, to its insurance agent; provided that such agent agrees to the confidential treatment of such information; and

(d) to the extent necessary to negotiate clauses that will be common to all service contracts.

Attachment 2, Part I

15.2    Confidential Information

For purposes hereof "Confidential Information" shall include technical information, customer lists and other business information or data relating to the Disclosing Party, its affiliates or other representatives that is reduced to writing and marked "Confidential" or with a similar designation by the Disclosing Party. Notwithstanding anything contained herein to the contrary, Confidential Information shall not include (i) information developed independently by the Receiving Party or lawfully received from a third party not under an obligation of confidentiality; or (ii) information in the public domain; or (iii) information disclosed pursuant to law, judicial order or governmental regulation.

16.    **GOVERNING LAW**

These Terms and Conditions shall be governed by the laws of the District of Columbia.

17.    **DISPUTE RESOLUTION**

The Customer and the Company agree to endeavor to settle all disputes, controversies or claims arising under this Agreement, or in connection with services provided pursuant to this Agreement, within sixty (60) days, or such longer period as may be mutually agreed upon, from the date that either party has given written notice of the existence of such dispute, controversy or claim to the other. If within such time the Customer and the Company have not been able to reach a settlement, either party may submit the dispute, controversy or claim for settlement by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce in effect on the date of the Agreement before a panel of three arbitrators designated pursuant to those rules and the decision shall be binding on the Customer and the Company. The place of arbitration shall be Paris, France, unless otherwise mutually agreed by the Company and the Customer. Any party to this Agreement may seek from a court of the District of Columbia or a United States Federal Court sitting in the District of Columbia any interim relief, including injunctive relief or confirmation of any arbitral award rendered in whole or in part. This Section shall not limit the rights of any party to obtain execution of judgment or to seek injunctive relief or specific performance in aid of such an award from a court of the District of Columbia or a United States Federal Court sitting in the District of Columbia.

18.    **NOTICES**

Any notices, reports and other communications in connection with this Agreement shall be in writing and shall be given by any two (2) of the

Attachment 2, Part I

following methods: hand, fax, international courier (such as TNT, DHL or Federal Express) or certified or registered mail to the fax number or address set forth in Schedule 1 to the Novation Agreement for such purpose.

Any such notice, report, or communication will be deemed to have been received on the calendar day following the transmission of the notice by fax, the day that it is delivered to the applicable address by hand or international courier or fifteen (15) calendar days after it has been dispatched by certified or registered mail.

Each of the Company and the Customer agrees to keep this information current at all times and to notify the other party promptly of any changes to the pertinent information related to invoicing, billing, utilization of the allotted capacity and general communications.

19.  **FORCE MAJEURE**

Except as set forth in Part I – Section 7.1, with respect to the Customer, neither the Company nor the Customer shall be liable for failure to perform under this Agreement due to any act, event or cause beyond its reasonable control ("Force Majeure Event") including, but not limited to:

(a)   acts of God, peril of the sea, accident of navigation, war, terrorism, riot, insurrection, civil commotion, national emergency (whether in fact or by law), martial law, fire, lightning, flood, cyclone, earthquake, landslide, storm or other adverse weather conditions, explosion, power shortage, strike or other labor difficulty (whether or not involving the Company's or the Customer's employees), epidemic, quarantine, radiation or radioactive contamination;

(b)   in the case of the Company, any action or inaction of any government or other competent authority (including any court of competent jurisdiction), including expropriation, restraint, prohibition, intervention, requisition, requirement, direction or embargo by legislation, regulation, decree or other legally enforceable order, or refusal to grant or revoke a license if such refusal is not occasioned by the failure of the Company to apply therefor, prosecute applications as necessary or to comply with applicable law or regulation; and

(c)   externally caused transmission interference or satellite failure, or satellite launch failure or delay, or satellite malfunction.

The Customer's rights in the event of certain government actions are set forth in Part I – Section 7.1.

Attachment 2, Part I

19.2    Certain Obligations.

In the event that a Force Majeure Event exceeds thirty (30) consecutive days, then following such thirty (30) day period, the Customer and the Company shall meet and negotiate the continuation, suspension, termination, restructuring or other disposition of this Agreement. Upon removal or cessation of the Force Majeure Event, all obligations under this Agreement shall resume.

## 20.    WARRANTY

Except as expressly set forth in the Intelsat Technical Standards, the Company makes no warranty, express or implied, regarding the performance of the service, and specifically disclaims any warranty of merchantability or fitness for a particular purpose.

## 21.    WAIVERS

A waiver by the Company or the Customer of any of the terms and conditions of this Agreement in any instance shall not be deemed or construed to be a waiver of such term or condition for the future, or of any subsequent breach thereof.

## 22.    RIGHTS CUMULATIVE; INVALIDITY

All rights and remedies conferred hereunder or otherwise shall be cumulative and may be exercised individually or concurrently. Failure by the Company or the Customer to enforce any of their respective rights hereunder shall not be deemed a waiver of future enforcement of such right or any other rights. If any provision of this Agreement is held to be invalid, it shall not affect any other provision of this Agreement.

Attachment 2, Part I

# EXHIBIT 2

 **Intelsat.**

Intelsat Global Sales and Marketing Ltd.
Building 3 Suite 214
Chiswick Park 566 Chiswick High Road
London W45YA United Kingdom
Telephone 44(0)208.899.6035 Fax 44(0)208.899.6194
VAT Number 678.787.558

Mr. Modeste Mutombo Kyamakosa
Telecommunications Adviser
Gecamines Exploitation
30-32, Blvd du Souverain
Bruxelles, 1170
BELGIUM

*3e TRIMESTRE 2002*

| | |
|---|---|
| Account Number: | 328 |
| Billing Period: | 01-Jul-2002 - 30-Sep-2002 |
| Invoice Date: | 01-Oct-2002 |
| Due Date: | 16-Dec-2002 |
| Customer VAT Number: | N/A |
| Invoice Number: | 328-200210-035 |

Summary of Charges

| Services | |
|---|---|
| Digital Carrier Service | **Amount** |
| Service Charges (USD) | 84,570.36 |
| TOTAL AMOUNT DUE (USD) | 84,570.36 |

*Refer to the last page for index of detailed invoices

CC:

Mr. Mutombo Kyamakosa
Conseiller Entelecommunications
GECAMINES EXPLOITATION
B.P 450
Lubumbashi
CONGO, DEM. REP. OF

Mr. Nyambu Muanda
Directeur General des Telecommunications
Department des P.T.T.
B.P. 7821
Kinshasa I
CONGO, DEM. REP. OF

**Wire Transfers:**
Payable to
Intelsat Global Sales and Marketing Ltd.
Citibank London
Account No. 10265683
Sort Code 18 50 08

**Checks:**
Payable to:
Intelsat Global Sales and Marketing Ltd.
Mail to:
Finance Director
Building 3 Suite 214
Chiswick Park 566 Chiswick High Road
London W45YA United Kingdom

# EXHIBIT 3

# *Rules of*
# *Arbitration*

*in force as from 1 January 1998*

**Cost scales effective as of 1 July 2003**

**International Chamber of Commerce**
38 cours Albert 1er
75008 Paris - France
Telephone +33 1 49 53 28 28
Fax +33 1 49 53 29 33
Web site www.iccwbo.org

The ICC Rules of Arbitration and their Appendices have
been translated into many different languages.
However, the English and French versions are the only
official texts.

© **International Chamber of Commerce 1997,
2001**

All rights reserved.

**ICC No.: publication 808**

**Date of this online publication: October 2004**

# FOREWORD

The closing decades of the twentieth century saw international commercial arbitration gain worldwide acceptance as the normal means of resolving international commercial disputes. National laws on arbitration have been modernized on all continents. International treaties on arbitration have been signed or adhered to with impressive success. Arbitration has become part of the curricula of large numbers of law schools. With the gradual removal of political and trade barriers and the rapid globalization of the world economy, new challenges have been created for arbitration institutions in response to the growing demand of parties for certainty and predictability, greater rapidity and flexibility as well as neutrality and efficacy in the resolution of international disputes.

Since the International Court of Arbitration was established in 1923, ICC arbitration has been constantly nourished by the experience gathered by the ICC International Court of Arbitration in the course of administering more than thirteen thousand international arbitration cases, now involving each year parties and arbitrators from over 100 countries and from a diversity of legal, economic, cultural and linguistic backgrounds.

The present ICC Rules of Arbitration came into effect on 1 January 1998. They are the result of an intensive, worldwide consultation process and constitute the first major revision of the Rules in more than 20 years. The changes made are designed to reduce delays and ambiguities and to fill certain gaps, taking into account the evolution of arbitration practice. The basic features of the ICC arbitration system have not been altered, however, notably its universality and flexibility, as well as the central role played by the ICC Court in the administration of arbitral cases.

Every ICC arbitration is conducted by an arbitral tribunal with responsibility for examining the merits of the case and rendering a final award. Each year, ICC arbitrations are held in numerous countries, in most major languages

3

and with arbitrators from all over the world. The work of those arbitral tribunals is monitored by the ICC Court, which meets weekly all year round. Composed of members from over 80 countries, the Court organizes and supervises arbitrations held under the ICC Rules of Arbitration. The Court must remain constantly alert to changes in the law and the practice of arbitration in all parts of the world and must adapt its working methods to the evolving needs of parties and arbitrators. For the day-to-day management of cases in many languages, the ICC Court is supported by a Secretariat based at the headquarters of the International Chamber of Commerce, in Paris.

Although the ICC Rules of Arbitration have been especially designed for arbitrations in an international context, they may also be used for non-international cases.

4

## STANDARD ICC ARBITRATION CLAUSE

The ICC recommends that all parties wishing to make reference to ICC arbitration in their contracts use the following standard clause.

Parties are reminded that it may be desirable for them to stipulate in the arbitration clause itself the law governing the contract, the number of arbitrators and the place and language of the arbitration. The parties' free choice of the law governing the contract and of the place and language of the arbitration is not limited by the ICC Rules of Arbitration.

Attention is called to the fact that the laws of certain countries require that parties to contracts expressly accept arbitration clauses, sometimes in a precise and particular manner.

The ICC Rules of Arbitration have been translated into several of the languages listed below. These translations are available on the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

### English

"All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules."

# STANDARD CLAUSE FOR AN ICC PRE-ARBITRAL REFEREE PROCEDURE AND ICC ARBITRATION

The ICC Pre-Arbitral Referee Procedure provides for the appointment of a person empowered to make certain orders that might be necessary prior to a case being referred to arbitration or the courts. Use of this procedure presupposes a written agreement between the parties. Where parties wish to have recourse to both the ICC Pre-Arbitral Referee Procedure and ICC arbitration, specific reference should be made to both procedures. The following standard clause is recommended:

"Any party to this contract shall have the right to have recourse to and shall be bound by the Pre-Arbitral Referee Procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.
All disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules of Arbitration."

For translations of this clause, please consult the web site of the ICC International Court of Arbitration:

**www.iccarbitration.org**

6

# RULES OF ARBITRATION OF THE
# INTERNATIONAL CHAMBER OF COMMERCE

## INTRODUCTORY PROVISIONS

### Article 1
### International Court of Arbitration

**1**

The International Court of Arbitration (the "Court") of the International Chamber of Commerce (the "ICC") is the arbitration body attached to the ICC. The statutes of the Court are set forth in Appendix I. Members of the Court are appointed by the World Council of the ICC. The function of the Court is to provide for the settlement by arbitration of business disputes of an international character in accordance with the Rules of Arbitration of the International Chamber of Commerce (the "Rules"). If so empowered by an arbitration agreement, the Court shall also provide for the settlement by arbitration in accordance with these Rules of business disputes not of an international character.

**2**

The Court does not itself settle disputes. It has the function of ensuring the application of these Rules. It draws up its own Internal Rules (Appendix II).

**3**

The Chairman of the Court or, in the Chairman's absence or otherwise at his request, one of its Vice-Chairmen shall have the power to take urgent decisions on behalf of the Court, provided that any such decision is reported to the Court at its next session.

**4**

As provided for in its Internal Rules, the Court may delegate to one or more committees composed of its members the power to take certain decisions, provided that any such decision is reported to the Court at its next session.

7

5

The Secretariat of the Court (the "Secretariat") under the direction of its Secretary General (the "Secretary General") shall have its seat at the headquarters of the ICC.

## Article 2
## Definitions

In these Rules:

(i) "Arbitral Tribunal" includes one or more arbitrators.

(ii) "Claimant" includes one or more claimants and "Respondent" includes one or more respondents.

(iii) "Award" includes, *inter alia*, an interim, partial or final Award.

## Article 3
## Written Notifications or Communications; Time Limits

1

All pleadings and other written communications submitted by any party, as well as all documents annexed thereto, shall be supplied in a number of copies sufficient to provide one copy for each party, plus one for each arbitrator, and one for the Secretariat. A copy of any communication from the Arbitral Tribunal to the parties shall be sent to the Secretariat.

2

All notifications or communications from the Secretariat and the Arbitral Tribunal shall be made to the last address of the party or its representative for whom the same are intended, as notified either by the party in question or by the other party. Such notification or communication may be made by delivery against receipt, registered post, courier, facsimile transmission, telex, telegram or any other means of telecommunication that provides a record of the sending thereof.

3

A notification or communication shall be deemed to have been made on the day it was received by the party itself

or by its representative, or would have been received if made in accordance with the preceding paragraph.

4

Periods of time specified in or fixed under the present Rules shall start to run on the day following the date a notification or communication is deemed to have been made in accordance with the preceding paragraph. When the day next following such date is an official holiday, or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall commence on the first following business day. Official holidays and non-business days are included in the calculation of the period of time. If the last day of the relevant period of time granted is an official holiday or a non-business day in the country where the notification or communication is deemed to have been made, the period of time shall expire at the end of the first following business day.

## COMMENCING THE ARBITRATION

### Article 4
### Request for Arbitration

1

A party wishing to have recourse to arbitration under these Rules shall submit its Request for Arbitration (the "Request") to the Secretariat, which shall notify the Claimant and Respondent of the receipt of the Request and the date of such receipt.

2

The date on which the Request is received by the Secretariat shall, for all purposes, be deemed to be the date of the commencement of the arbitral proceedings.

3

The Request shall, *inter alia*, contain the following information:

9

a) the name in full, description and address of each of the parties;

b) a description of the nature and circumstances of the dispute giving rise to the claim(s);

c) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) claimed;

d) the relevant agreements and, in particular, the arbitration agreement;

e) all relevant particulars concerning the number of arbitrators and their choice in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

f) any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

4

Together with the Request, the Claimant shall submit the number of copies thereof required by Article 3(1) and shall make the advance payment on administrative expenses required by Appendix III ("Arbitration Costs and Fees") in force on the date the Request is submitted. In the event that the Claimant fails to comply with either of these requirements, the Secretariat may fix a time limit within which the Claimant must comply, failing which the file shall be closed without prejudice to the right of the Claimant to submit the same claims at a later date in another Request.

5

The Secretariat shall send a copy of the Request and the documents annexed thereto to the Respondent for its Answer to the Request once the Secretariat has sufficient copies of the Request and the required advance payment.

6

When a party submits a Request in connection with a legal relationship in respect of which arbitration proceedings between the same parties are already pending under these Rules, the Court may, at the request

of a party, decide to include the claims contained in the Request in the pending proceedings provided that the Terms of Reference have not been signed or approved by the Court. Once the Terms of Reference have been signed or approved by the Court, claims may only be included in the pending proceedings subject to the provisions of Article 19.

## Article 5
## Answer to the Request; Counterclaims

1

Within 30 days from the receipt of the Request from the Secretariat, the Respondent shall file an Answer (the "Answer") which shall, *inter alia*, contain the following information:

a)  its name in full, description and address;

b)  its comments as to the nature and circumstances of the dispute giving rise to the claim(s);

c)  its response to the relief sought;

d)  any comments concerning the number of arbitrators and their choice in light of the Claimant's proposals and in accordance with the provisions of Articles 8, 9 and 10, and any nomination of an arbitrator required thereby; and

e)  any comments as to the place of arbitration, the applicable rules of law and the language of the arbitration.

2

The Secretariat may grant the Respondent an extension of the time for filing the Answer, provided the application for such an extension contains the Respondent's comments concerning the number of arbitrators and their choice and, where required by Articles 8, 9 and 10, the nomination of an arbitrator. If the Respondent fails to do so, the Court shall proceed in accordance with these Rules.

3

The Answer shall be supplied to the Secretariat in the number of copies specified by Article 3(1).

11

4

A copy of the Answer and the documents annexed thereto shall be communicated by the Secretariat to the Claimant.

5

Any counterclaim(s) made by the Respondent shall be filed with its Answer and shall provide:

a) a description of the nature and circumstances of the dispute giving rise to the counterclaim(s); and

b) a statement of the relief sought, including, to the extent possible, an indication of any amount(s) counterclaimed.

6

The Claimant shall file a reply to any counterclaim within 30 days from the date of receipt of the counterclaim(s) communicated by the Secretariat. The Secretariat may grant the Claimant an extension of time for filing the reply.

## Article 6
## Effect of the Arbitration Agreement

1

Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings, unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement.

2

If the Respondent does not file an Answer, as provided by Article 5, or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is *prima facie* satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral

Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. In such a case, any party retains the right to ask any court having jurisdiction whether or not there is a binding arbitration agreement.

3

If any of the parties refuses or fails to take part in the arbitration or any stage thereof, the arbitration shall proceed notwithstanding such refusal or failure.

4

Unless otherwise agreed, the Arbitral Tribunal shall not cease to have jurisdiction by reason of any claim that the contract is null and void or allegation that it is non-existent, provided that the Arbitral Tribunal upholds the validity of the arbitration agreement. The Arbitral Tribunal shall continue to have jurisdiction to determine the respective rights of the parties and to adjudicate their claims and pleas even though the contract itself may be non-existent or null and void.

## THE ARBITRAL TRIBUNAL

## Article 7
## General Provisions

1

Every arbitrator must be and remain independent of the parties involved in the arbitration.

2

Before appointment or confirmation, a prospective arbitrator shall sign a statement of independence and disclose in writing to the Secretariat any facts or circumstances which might be of such a nature as to call into question the arbitrator's independence in the eyes of the parties. The Secretariat shall provide such information to the parties in writing and fix a time limit for any comments from them.

3

An arbitrator shall immediately disclose in writing to the Secretariat and to the parties any facts or circumstances of a similar nature which may arise during the arbitration.

4

The decisions of the Court as to the appointment, confirmation, challenge or replacement of an arbitrator shall be final and the reasons for such decisions shall not be communicated.

5

By accepting to serve, every arbitrator undertakes to carry out his responsibilities in accordance with these Rules.

6

Insofar as the parties have not provided otherwise, the Arbitral Tribunal shall be constituted in accordance with the provisions of Articles 8, 9 and 10.

## Article 8
## Number of Arbitrators

1

The disputes shall be decided by a sole arbitrator or by three arbitrators.

2

Where the parties have not agreed upon the number of arbitrators, the Court shall appoint a sole arbitrator, save where it appears to the Court that the dispute is such as to warrant the appointment of three arbitrators. In such case, the Claimant shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the decision of the Court, and the Respondent shall nominate an arbitrator within a period of 15 days from the receipt of the notification of the nomination made by the Claimant.

3

Where the parties have agreed that the dispute shall be settled by a sole arbitrator, they may, by agreement,

nominate the sole arbitrator for confirmation. If the parties fail to nominate a sole arbitrator within 30 days from the date when the Claimant's Request for Arbitration has been received by the other party, or within such additional time as may be allowed by the Secretariat, the sole arbitrator shall be appointed by the Court.

4

Where the dispute is to be referred to three arbitrators, each party shall nominate in the Request and the Answer, respectively, one arbitrator for confirmation. If a party fails to nominate an arbitrator, the appointment shall be made by the Court. The third arbitrator, who will act as chairman of the Arbitral Tribunal, shall be appointed by the Court, unless the parties have agreed upon another procedure for such appointment, in which case the nomination will be subject to confirmation pursuant to Article 9. Should such procedure not result in a nomination within the time limit fixed by the parties or the Court, the third arbitrator shall be appointed by the Court.

## Article 9
## Appointment and Confirmation of the Arbitrators

1

In confirming or appointing arbitrators, the Court shall consider the prospective arbitrator's nationality, residence and other relationships with the countries of which the parties or the other arbitrators are nationals and the prospective arbitrator's availability and ability to conduct the arbitration in accordance with these Rules. The same shall apply where the Secretary General confirms arbitrators pursuant to Article 9(2).

2

The Secretary General may confirm as co-arbitrators, sole arbitrators and chairmen of Arbitral Tribunals persons nominated by the parties or pursuant to their particular agreements, provided they have filed a statement of independence without qualification or a qualified statement of independence has not given rise to

1 5

objections. Such confirmation shall be reported to the Court at its next session. If the Secretary General considers that a co-arbitrator, sole arbitrator or chairman of an Arbitral Tribunal should not be confirmed, the matter shall be submitted to the Court.

3

Where the Court is to appoint a sole arbitrator or the chairman of an Arbitral Tribunal, it shall make the appointment upon a proposal of a National Committee of the ICC that it considers to be appropriate. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, the Court may repeat its request or may request a proposal from another National Committee that it considers to be appropriate.

4

Where the Court considers that the circumstances so demand, it may choose the sole arbitrator or the chairman of the Arbitral Tribunal from a country where there is no National Committee, provided that neither of the parties objects within the time limit fixed by the Court.

5

The sole arbitrator or the chairman of the Arbitral Tribunal shall be of a nationality other than those of the parties. However, in suitable circumstances and provided that neither of the parties objects within the time limit fixed by the Court, the sole arbitrator or the chairman of the Arbitral Tribunal may be chosen from a country of which any of the parties is a national.

6

Where the Court is to appoint an arbitrator on behalf of a party which has failed to nominate one, it shall make the appointment upon a proposal of the National Committee of the country of which that party is a national. If the Court does not accept the proposal made, or if the National Committee fails to make the proposal requested within the time limit fixed by the Court, or if the country of which the said party is a national has no National

*ICC Rules of Arbitration*

Committee, the Court shall be at liberty to choose any person whom it regards as suitable. The Secretariat shall inform the National Committee, if one exists, of the country of which such person is a national.

## Article 10
## Multiple Parties

1

Where there are multiple parties, whether as Claimant or as Respondent, and where the dispute is to be referred to three arbitrators, the multiple Claimants, jointly, and the multiple Respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 9.

2

In the absence of such a joint nomination and where all parties are unable to agree to a method for the constitution of the Arbitral Tribunal, the Court may appoint each member of the Arbitral Tribunal and shall designate one of them to act as chairman. In such case, the Court shall be at liberty to choose any person it regards as suitable to act as arbitrator, applying Article 9 when it considers this appropriate.

## Article 11
## Challenge of Arbitrators

1

A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.

2

For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.

3

The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

## Article 12
## Replacement of Arbitrators

1

An arbitrator shall be replaced upon his death, upon the acceptance by the Court of the arbitrator's resignation, upon acceptance by the Court of a challenge, or upon the request of all the parties.

2

An arbitrator shall also be replaced on the Court's own initiative when it decides that he is prevented *de jure* or *de facto* from fulfilling his functions, or that he is not fulfilling his functions in accordance with the Rules or within the prescribed time limits.

3

When, on the basis of information that has come to its attention, the Court considers applying Article 12(2), it shall decide on the matter after the arbitrator concerned, the parties and any other members of the Arbitral Tribunal have had an opportunity to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

4

When an arbitrator is to be replaced, the Court has discretion to decide whether or not to follow the original nominating process. Once reconstituted, and after having invited the parties to comment, the Arbitral Tribunal shall determine if and to what extent prior proceedings shall be repeated before the reconstituted Arbitral Tribunal.

5

Subsequent to the closing of the proceedings, instead of replacing an arbitrator who has died or been removed by the Court pursuant to Articles 12(1) and 12(2), the Court may decide, when it considers it appropriate, that the remaining arbitrators shall continue the arbitration. In making such determination, the Court shall take into account the views of the remaining arbitrators and of the parties and such other matters that it considers appropriate in the circumstances.

## THE ARBITRAL PROCEEDINGS

### Article 13
### Transmission of the File to the Arbitral Tribunal

The Secretariat shall transmit the file to the Arbitral Tribunal as soon as it has been constituted, provided the advance on costs requested by the Secretariat at this stage has been paid.

### Article 14
### Place of the Arbitration

1

The place of the arbitration shall be fixed by the Court unless agreed upon by the parties.

2

The Arbitral Tribunal may, after consultation with the parties, conduct hearings and meetings at any location it considers appropriate unless otherwise agreed by the parties.

3

The Arbitral Tribunal may deliberate at any location it considers appropriate.

## Article 15
## Rules Governing the Proceedings

1

The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.

2

In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

## Article 16
## Language of the Arbitration

In the absence of an agreement by the parties, the Arbitral Tribunal shall determine the language or languages of the arbitration, due regard being given to all relevant circumstances, including the language of the contract.

## Article 17
## Applicable Rules of Law

1

The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate.

2

In all cases the Arbitral Tribunal shall take account of the provisions of the contract and the relevant trade usages.

3

The Arbitral Tribunal shall assume the powers of an *amiable compositeur* or decide *ex aequo et bono* only if the parties have agreed to give it such powers.

## Article 18
## Terms of Reference; Procedural Timetable

1

As soon as it has received the file from the Secretariat, the Arbitral Tribunal shall draw up, on the basis of documents or in the presence of the parties and in the light of their most recent submissions, a document defining its Terms of Reference. This document shall include the following particulars:

a)  the full names and descriptions of the parties;

b)  the addresses of the parties to which notifications and communications arising in the course of the arbitration may be made;

c)  a summary of the parties' respective claims and of the relief sought by each party, with an indication to the extent possible of the amounts claimed or counterclaimed;

d)  unless the Arbitral Tribunal considers it inappropriate, a list of issues to be determined;

e)  the full names, descriptions and addresses of the arbitrators;

f)  the place of the arbitration; and

g)  particulars of the applicable procedural rules and, if such is the case, reference to the power conferred upon the Arbitral Tribunal to act as *amiable compositeur* or to decide *ex aequo et bono*.

2

The Terms of Reference shall be signed by the parties and the Arbitral Tribunal. Within two months of the date on which the file has been transmitted to it, the Arbitral Tribunal shall transmit to the Court the Terms of Reference signed by it and by the parties. The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

3

If any of the parties refuses to take part in the drawing up of the Terms of Reference or to sign the same, they shall

be submitted to the Court for approval. When the Terms of Reference have been signed in accordance with Article 18(2) or approved by the Court, the arbitration shall proceed.

4

When drawing up the Terms of Reference, or as soon as possible thereafter, the Arbitral Tribunal, after having consulted the parties, shall establish in a separate document a provisional timetable that it intends to follow for the conduct of the arbitration and shall communicate it to the Court and the parties. Any subsequent modifications of the provisional timetable shall be communicated to the Court and the parties.

## Article 19
## New Claims

After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances.

## Article 20
## Establishing the Facts of the Case

1

The Arbitral Tribunal shall proceed within as short a time as possible to establish the facts of the case by all appropriate means.

2

After studying the written submissions of the parties and all documents relied upon, the Arbitral Tribunal shall hear the parties together in person if any of them so requests or, failing such a request, it may of its own motion decide to hear them.

3

The Arbitral Tribunal may decide to hear witnesses, experts appointed by the parties or any other person, in

the presence of the parties, or in their absence provided they have been duly summoned.

**4**

The Arbitral Tribunal, after having consulted the parties, may appoint one or more experts, define their terms of reference and receive their reports. At the request of a party, the parties shall be given the opportunity to question at a hearing any such expert appointed by the Tribunal.

**5**

At any time during the proceedings, the Arbitral Tribunal may summon any party to provide additional evidence.

**6**

The Arbitral Tribunal may decide the case solely on the documents submitted by the parties unless any of the parties requests a hearing.

**7**

The Arbitral Tribunal may take measures for protecting trade secrets and confidential information.

## Article 21
## Hearings

**1**

When a hearing is to be held, the Arbitral Tribunal, giving reasonable notice, shall summon the parties to appear before it on the day and at the place fixed by it.

**2**

If any of the parties, although duly summoned, fails to appear without valid excuse, the Arbitral Tribunal shall have the power to proceed with the hearing.

**3**

The Arbitral Tribunal shall be in full charge of the hearings, at which all the parties shall be entitled to be present. Save with the approval of the Arbitral Tribunal and the parties, persons not involved in the proceedings shall not be admitted.

4

The parties may appear in person or through duly authorized representatives. In addition, they may be assisted by advisers.

## Article 22
## Closing of the Proceedings

1

When it is satisfied that the parties have had a reasonable opportunity to present their cases, the Arbitral Tribunal shall declare the proceedings closed. Thereafter, no further submission or argument may be made, or evidence produced, unless requested or authorized by the Arbitral Tribunal.

2

When the Arbitral Tribunal has declared the proceedings closed, it shall indicate to the Secretariat an approximate date by which the draft Award will be submitted to the Court for approval pursuant to Article 27. Any postponement of that date shall be communicated to the Secretariat by the Arbitral Tribunal.

## Article 23
## Conservatory and Interim Measures

1

Unless the parties have otherwise agreed, as soon as the file has been transmitted to it, the Arbitral Tribunal may, at the request of a party, order any interim or conservatory measure it deems appropriate. The Arbitral Tribunal may make the granting of any such measure subject to appropriate security being furnished by the requesting party. Any such measure shall take the form of an order, giving reasons, or of an Award, as the Arbitral Tribunal considers appropriate.

2

Before the file is transmitted to the Arbitral Tribunal, and in appropriate circumstances even thereafter, the parties may apply to any competent judicial authority for interim

or conservatory measures. The application of a party to a judicial authority for such measures or for the implementation of any such measures ordered by an Arbitral Tribunal shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the Arbitral Tribunal. Any such application and any measures taken by the judicial authority must be notified without delay to the Secretariat. The Secretariat shall inform the Arbitral Tribunal thereof.

## AWARDS

## Article 24
## Time Limit for the Award

1

The time limit within which the Arbitral Tribunal must render its final Award is six months. Such time limit shall start to run from the date of the last signature by the Arbitral Tribunal or by the parties of the Terms of Reference or, in the case of application of Article 18(3), the date of the notification to the Arbitral Tribunal by the Secretariat of the approval of the Terms of Reference by the Court.

2

The Court may extend this time limit pursuant to a reasoned request from the Arbitral Tribunal or on its own initiative if it decides it is necessary to do so.

## Article 25
## Making of the Award

1

When the Arbitral Tribunal is composed of more than one arbitrator, an Award is given by a majority decision. If there be no majority, the Award shall be made by the chairman of the Arbitral Tribunal alone.

*ICC Rules of Arbitration*

2

The Award shall state the reasons upon which it is based.

3

The Award shall be deemed to be made at the place of the arbitration and on the date stated therein.

## Article 26
## Award by Consent

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

## Article 27
## Scrutiny of the Award by the Court

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

## Article 28
## Notification, Deposit and Enforceability of the Award

1

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

**3**

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

**4**

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

**5**

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

**6**

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

## Article 29
## Correction and Interpretation of the Award

**1**

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

**2**

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments

thereon. If the Arbitral Tribunal decides to correct or interpret the Award, it shall submit its decision in draft form to the Court not later than 30 days following the expiration of the time limit for the receipt of any comments from the other party or within such other period as the Court may decide.

**3**

The decision to correct or to interpret the Award shall take the form of an addendum and shall constitute part of the Award. The provisions of Articles 25, 27 and 28 shall apply *mutatis mutandis*.

## COSTS

### Article 30
### Advance to Cover the Costs of the Arbitration

**1**

After receipt of the Request, the Secretary General may request the Claimant to pay a provisional advance in an amount intended to cover the costs of arbitration until the Terms of Reference have been drawn up.

**2**

As soon as practicable, the Court shall fix the advance on costs in an amount likely to cover the fees and expenses of the arbitrators and the ICC administrative costs for the claims and counterclaims which have been referred to it by the parties. This amount may be subject to readjustment at any time during the arbitration. Where, apart from the claims, counterclaims are submitted, the Court may fix separate advances on costs for the claims and the counterclaims.

**3**

The advance on costs fixed by the Court shall be payable in equal shares by the Claimant and the Respondent. Any provisional advance paid on the basis of Article 30(1) will

be considered as a partial payment thereof. However, any party shall be free to pay the whole of the advance on costs in respect of the principal claim or the counterclaim should the other party fail to pay its share. When the Court has set separate advances on costs in accordance with Article 30(2), each of the parties shall pay the advance on costs corresponding to its claims.

4

When a request for an advance on costs has not been complied with, and after consultation with the Arbitral Tribunal, the Secretary General may direct the Arbitral Tribunal to suspend its work and set a time limit, which must be not less than 15 days, on the expiry of which the relevant claims, or counterclaims, shall be considered as withdrawn. Should the party in question wish to object to this measure, it must make a request within the aforementioned period for the matter to be decided by the Court. Such party shall not be prevented, on the ground of such withdrawal, from reintroducing the same claims or counterclaims at a later date in another proceeding.

5

If one of the parties claims a right to a set-off with regard to either claims or counterclaims, such set-off shall be taken into account in determining the advance to cover the costs of arbitration in the same way as a separate claim insofar as it may require the Arbitral Tribunal to consider additional matters.

## Article 31
## Decision as to the Costs of the Arbitration

1

The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

29

**2**

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.

**3**

The final Award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.

## MISCELLANEOUS

## Article 32
## Modified Time Limits

**1**

The parties may agree to shorten the various time limits set out in these Rules. Any such agreement entered into subsequent to the constitution of an Arbitral Tribunal shall become effective only upon the approval of the Arbitral Tribunal.

**2**

The Court, on its own initiative, may extend any time limit which has been modified pursuant to Article 32(1) if it decides that it is necessary to do so in order that the Arbitral Tribunal or the Court may fulfil their responsibilities in accordance with these Rules.

## Article 33
## Waiver

A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal,

or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object.

## Article 34
## Exclusion of Liability

Neither the arbitrators, nor the Court and its members, nor the ICC and its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

## Article 35
## General Rule

In all matters not expressly provided for in these Rules, the Court and the Arbitral Tribunal shall act in the spirit of these Rules and shall make every effort to make sure that the Award is enforceable at law.

# APPENDIX I
## STATUTES OF THE INTERNATIONAL
## COURT OF ARBITRATION OF THE ICC

## Article 1
## Function

1

The function of the International Court of Arbitration of the International Chamber of Commerce (the "Court") is to ensure the application of the Rules of Arbitration of the International Chamber of Commerce, and it has all the necessary powers for that purpose.

2

As an autonomous body, it carries out these functions in complete independence from the ICC and its organs.

3

Its members are independent from the ICC National Committees.

## Article 2
## Composition of the Court

The Court shall consist of a Chairman, Vice-Chairmen, and members and alternate members (collectively designated as members). In its work it is assisted by its Secretariat (Secretariat of the Court).

## Article 3
## Appointment

1

The Chairman is elected by the ICC World Council upon the recommendation of the Executive Board of the ICC.

2

The ICC World Council appoints the Vice-Chairmen of the Court from among the members of the Court or otherwise.

3

Its members are appointed by the ICC World Council on the proposal of National Committees, one member for each Committee.

4

On the proposal of the Chairman of the Court, the World Council may appoint alternate members.

5

The term of office of all members is three years. If a member is no longer in a position to exercise his functions, his successor is appointed by the World Council for the remainder of the term.

## Article 4
## Plenary Session of the Court

The Plenary Sessions of the Court are presided over by the Chairman or, in his absence, by one of the Vice-Chairmen designated by him. The deliberations shall be valid when at least six members are present. Decisions are taken by a majority vote, the Chairman having a casting vote in the event of a tie.

## Article 5
## Committees

The Court may set up one or more Committees and establish the functions and organization of such Committees.

## Article 6
## Confidentiality

The work of the Court is of a confidential nature which must be respected by everyone who participates in that work in whatever capacity. The Court lays down the rules regarding the persons who can attend the meetings of the Court and its Committees and who are entitled to have access to the materials submitted to the Court and its Secretariat.

*Appendix I to the ICC Rules of Arbitration*

## Article 7
## Modification of the Rules of Arbitration

Any proposal of the Court for a modification of the Rules is laid before the Commission on Arbitration before submission to the Executive Board and the World Council of the ICC for approval.

## APPENDIX II
## INTERNAL RULES OF THE INTERNATIONAL COURT OF ARBITRATION OF THE ICC

### Article 1
### Confidential Character of the Work of the International Court of Arbitration

1

The sessions of the Court, whether plenary or those of a Committee of the Court, are open only to its members and to the Secretariat.

2

However, in exceptional circumstances, the Chairman of the Court may invite other persons to attend. Such persons must respect the confidential nature of the work of the Court.

3

The documents submitted to the Court, or drawn up by it in the course of its proceedings, are communicated only to the members of the Court and to the Secretariat and to persons authorized by the Chairman to attend Court sessions.

4

The Chairman or the Secretary General of the Court may authorize researchers undertaking work of a scientific nature on international trade law to acquaint themselves with Awards and other documents of general interest, with the exception of memoranda, notes, statements and documents remitted by the parties within the framework of arbitration proceedings.

5

Such authorization shall not be given unless the beneficiary has undertaken to respect the confidential character of the documents made available and to refrain from any publication in their respect without having previously submitted the text for approval to the Secretary General of the Court.

35

*Appendix II to the ICC Rules of Arbitration*

6

The Secretariat will in each case submitted to arbitration under the Rules retain in the archives of the Court all Awards, Terms of Reference and decisions of the Court, as well as copies of the pertinent correspondence of the Secretariat.

7

Any documents, communications or correspondence submitted by the parties or the arbitrators may be destroyed unless a party or an arbitrator requests in writing within a period fixed by the Secretariat the return of such documents. All related costs and expenses for the return of those documents shall be paid by such party or arbitrator.

## Article 2
## Participation of Members of the International Court of Arbitration in ICC Arbitration

1

The Chairman and the members of the Secretariat of the Court may not act as arbitrators or as counsel in cases submitted to ICC arbitration.

2

The Court shall not appoint Vice-Chairmen or members of the Court as arbitrators. They may, however, be proposed for such duties by one or more of the parties, or pursuant to any other procedure agreed upon by the parties, subject to confirmation.

3

When the Chairman, a Vice-Chairman or a member of the Court or of the Secretariat is involved in any capacity whatsoever in proceedings pending before the Court, such person must inform the Secretary General of the Court upon becoming aware of such involvement.

4

Such person must refrain from participating in the discussions or in the decisions of the Court concerning

the proceedings and must be absent from the courtroom whenever the matter is considered.

5

Such person will not receive any material documentation or information pertaining to such proceedings.

## Article 3
## Relations between the Members of the Court and the ICC National Committees

1

By virtue of their capacity, the members of the Court are independent of the ICC National Committees which proposed them for appointment by the ICC World Council.

2

Furthermore, they must regard as confidential, vis-à-vis the said National Committees, any information concerning individual cases with which they have become acquainted in their capacity as members of the Court, except when they have been requested by the Chairman of the Court or by its Secretary General to communicate specific information to their respective National Committees.

## Article 4
## Committee of the Court

1

In accordance with the provisions of Article 1(4) of the Rules and Article 5 of its Statutes (Appendix I), the Court hereby establishes a Committee of the Court.

2

The members of the Committee consist of a Chairman and at least two other members. The Chairman of the Court acts as the Chairman of the Committee. If absent, the Chairman may designate a Vice-Chairman of the Court or, in exceptional circumstances, another member of the Court as Chairman of the Committee.

*Appendix II to the ICC Rules of Arbitration*

3

The other two members of the Committee are appointed by the Court from among the Vice-Chairmen or the other members of the Court. At each Plenary Session the Court appoints the members who are to attend the meetings of the Committee to be held before the next Plenary Session.

4

The Committee meets when convened by its Chairman. Two members constitute a quorum.

5

(a)      The Court shall determine the decisions that may be taken by the Committee.

(b)      The decisions of the Committee are taken unanimously.

(c)      When the Committee cannot reach a decision or deems it preferable to abstain, it transfers the case to the next Plenary Session, making any suggestions it deems appropriate.

(d)      The Committee's decisions are brought to the notice of the Court at its next Plenary Session.

## Article 5
## Court Secretariat

1

In case of absence, the Secretary General may delegate to the General Counsel and Deputy Secretary General the authority to confirm arbitrators, to certify true copies of Awards and to request the payment of a provisional advance, respectively provided for in Articles 9(2), 28(2) and 30(1) of the Rules.

2

The Secretariat may, with the approval of the Court, issue notes and other documents for the information of the parties and the arbitrators, or as necessary for the proper conduct of the arbitral proceedings.

*Appendix II to the ICC Rules of Arbitration*

## Article 6
## Scrutiny of Arbitral Awards

When the Court scrutinizes draft Awards in accordance with Article 27 of the Rules, it considers, to the extent practicable, the requirements of mandatory law at the place of arbitration.

# APPENDIX III
# ARBITRATION COSTS AND FEES

## Article 1
## Advance on Costs

1

Each request to commence an arbitration pursuant to the Rules must be accompanied by an advance payment of US$ 2,500 on the administrative expenses. Such payment is non-refundable, and shall be credited to the Claimant's portion of the advance on costs.

2

The provisional advance fixed by the Secretary General according to Article 30(1) of the Rules shall normally not exceed the amount obtained by adding together the administrative expenses, the minimum of the fees (as set out in the scale hereinafter) based upon the amount of the claim and the expected reimbursable expenses of the Arbitral Tribunal incurred with respect to the drafting of the Terms of Reference. If such amount is not quantified, the provisional advance shall be fixed at the discretion of the Secretary General. Payment by the Claimant shall be credited to its share of the advance on costs fixed by the Court.

3

In general, after the Terms of Reference have been signed or approved by the Court and the provisional timetable has been established, the Arbitral Tribunal shall, in accordance with Article 30(4) of the Rules, proceed only with respect to those claims or counterclaims in regard to which the whole of the advance on costs has been paid.

4

The advance on costs fixed by the Court according to Article 30(2) of the Rules comprises the fees of the arbitrator or arbitrators (hereinafter referred to as "arbitrator"), any arbitration-related expenses of the arbitrator and the administrative expenses.

40

5

Each party shall pay in cash its share of the total advance on costs. However, if its share exceeds an amount fixed from time to time by the Court, a party may post a bank guarantee for this additional amount.

6

A party that has already paid in full its share of the advance on costs fixed by the Court may, in accordance with Article 30(3) of the Rules, pay the unpaid portion of the advance owed by the defaulting party by posting a bank guarantee.

7

When the Court has fixed separate advances on costs pursuant to Article 30(2) of the Rules, the Secretariat shall invite each party to pay the amount of the advance corresponding to its respective claim(s).

8

When, as a result of the fixing of separate advances on costs, the separate advance fixed for the claim of either party exceeds one half of such global advance as was previously fixed (in respect of the same claims and counterclaims that are the subject of separate advances), a bank guarantee may be posted to cover any such excess amount. In the event that the amount of the separate advance is subsequently increased, at least one half of the increase shall be paid in cash.

9

The Secretariat shall establish the terms governing all bank guarantees which the parties may post pursuant to the above provisions.

10

As provided in Article 30(2) of the Rules, the advance on costs may be subject to readjustment at any time during the arbitration, in particular to take into account fluctuations in the amount in dispute, changes in the amount of the estimated expenses of the arbitrator, or the evolving difficulty or complexity of arbitration proceedings.

11

Before any expertise ordered by the Arbitral Tribunal can be commenced, the parties, or one of them, shall pay an advance on costs fixed by the Arbitral Tribunal sufficient to cover the expected fees and expenses of the expert as determined by the Arbitral Tribunal. The Arbitral Tribunal shall be responsible for ensuring the payment by the parties of such fees and expenses.

## Article 2
## Costs and Fees

1

Subject to Article 31(2) of the Rules, the Court shall fix the fees of the arbitrator in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its discretion.

2

In setting the arbitrator's fees, the Court shall take into consideration the diligence of the arbitrator, the time spent, the rapidity of the proceedings, and the complexity of the dispute, so as to arrive at a figure within the limits specified or, in exceptional circumstances (Article 31(2) of the Rules), at a figure higher or lower than those limits.

3

When a case is submitted to more than one arbitrator, the Court, at its discretion, shall have the right to increase the total fees up to a maximum which shall normally not exceed three times the fees of one arbitrator.

4

The arbitrator's fees and expenses shall be fixed exclusively by the Court as required by the Rules. Separate fee arrangements between the parties and the arbitrator are contrary to the Rules.

5

The Court shall fix the administrative expenses of each arbitration in accordance with the scale hereinafter set out or, where the sum in dispute is not stated, at its

42

discretion. In exceptional circumstances, the Court may fix the administrative expenses at a lower or higher figure than that which would result from the application of such scale, provided that such expenses shall normally not exceed the maximum amount of the scale. Further, the Court may require the payment of administrative expenses in addition to those provided in the scale of administrative expenses as a condition to holding an arbitration in abeyance at the request of the parties or of one of them with the acquiescence of the other.

6

If an arbitration terminates before the rendering of a final Award, the Court shall fix the costs of the arbitration at its discretion, taking into account the stage attained by the arbitral proceedings and any other relevant circumstances.

7

In the case of an application under Article 29(2) of the Rules, the Court may fix an advance to cover additional fees and expenses of the Arbitral Tribunal and may make the transmission of such application to the Arbitral Tribunal subject to the prior cash payment in full to the ICC of such advance. The Court shall fix at its discretion any possible fees of the arbitrator when approving the decision of the Arbitral Tribunal.

8

When an arbitration is preceded by an attempt at amicable resolution pursuant to the ICC ADR Rules, one half of the administrative expenses paid for such ADR proceedings shall be credited to the administrative expenses of the arbitration.

9

Amounts paid to the arbitrator do not include any possible value added taxes (VAT) or other taxes or charges and imposts applicable to the arbitrator's fees. Parties have a duty to pay any such taxes or charges; however, the recovery of any such charges or taxes is a matter solely between the arbitrator and the parties.

## Article 3
## ICC as Appointing Authority

Any request received for an authority of the ICC to act as appointing authority will be treated in accordance with the Rules of ICC as Appointing Authority in UNCITRAL or Other *Ad Hoc* Arbitration Proceedings and shall be accompanied by a non-refundable sum of US$ 2,500. No request shall be processed unless accompanied by the said sum. For additional services, ICC may at its discretion fix administrative expenses, which shall be commensurate with the services provided and shall not exceed the maximum sum of US$ 10,000.

## Article 4
## Scales of Administrative Expenses and Arbitrator's Fees

1

The Scales of Administrative Expenses and Arbitrator's Fees set forth below shall be effective as of 1 July 2003 in respect of all arbitrations commenced on or after such date, irrespective of the version of the Rules applying to such arbitrations.

2

To calculate the administrative expenses and the arbitrator's fees, the amounts calculated for each successive slice of the sum in dispute must be added together, except that where the sum in dispute is over US$ 80 million, a flat amount of US$ 88,800 shall constitute the entirety of the administrative expenses.

*Appendix III to the ICC Rules of Arbitration*

## A. ADMINISTRATIVE EXPENSES

| Sum in dispute (in US Dollars) | | | Administrative expenses(*) |
|---|---|---|---|
| up to | 50 000 | | $ 2 500 |
| from | 50 001 | to    100 000 | 3.50% |
| from | 100 001 | to    500 000 | 1.70% |
| from | 500 001 | to    1 000 000 | 1.15% |
| from | 1 000 001 | to    2 000 000 | 0.70% |
| from | 2 000 001 | to    5 000 000 | 0.30% |
| from | 5 000 001 | to    10 000 000 | 0.20% |
| from | 10 000 001 | to    50 000 000 | 0.07% |
| from | 50 000 001 | to    80 000 000 | 0.06% |
| over | 80 000 000 | | $ 88 800 |

*(*) For illustrative purposes only, the table on the following page indicates the resulting administrative expenses in US$ when the proper calculations have been made.*

## B. ARBITRATOR'S FEES

| Sum in dispute (in US Dollars) | | | Fees(**) | |
|---|---|---|---|---|
| | | | minimum | maximum |
| up to | 50 000 | | $ 2 500 | 17.00% |
| from | 50 001 | to    100 000 | 2.00% | 11.00% |
| from | 100 001 | to    500 000 | 1.00% | 5.50% |
| from | 500 001 | to    1 000 000 | 0.75% | 3.50% |
| from | 1 000 001 | to    2 000 000 | 0.50% | 2.75% |
| from | 2 000 001 | to    5 000 000 | 0.25% | 1.12% |
| from | 5 000 001 | to    10 000 000 | 0.10% | 0.616% |
| from | 10 000 001 | to    50 000 000 | 0.05% | 0.193% |
| from | 50 000 001 | to    80 000 000 | 0.03% | 0.136% |
| from | 80 000 001 | to    100 000 000 | 0.02% | 0.112% |
| over | 100 000 000 | | 0.01% | 0.056% |

*(**) For illustrative purposes only, the table on the following page indicates the resulting range of fees when the proper calculations have been made.*

*Appendix III to the ICC Rules of Arbitration*

| SUM IN DISPUTE (in US Dollars) | | | A. ADMINISTRATIVE EXPENSES(*) (in US Dollars) | B. ARBITRATOR'S FEES(**) (in US Dollars) | |
|---|---|---|---|---|---|
| | | | | Minimum | Maximum |
| | | | | | 17.00% of amount in dispute |
| up to | | 50 000 | 2 500 | 2 500 | 17.00% of amount in dispute |
| from | 50 001 to | 100 000 | 2 500 + 3.50% of amt. over 50 000 | 2 500 + 2.00% of amt. over 50 000 | 8 500 + 11.00% of amt. over 50 000 |
| from | 100 001 to | 500 000 | 4 250 + 1.70% of amt. over 100 000 | 3 500 + 1.00% of amt. over 100 000 | 14 000 + 5.50% of amt. over 100 000 |
| from | 500 001 to | 1 000 000 | 11 050 + 1.15% of amt. over 500 000 | 7 500 + 0.75% of amt. over 500 000 | 36 000 + 3.50% of amt. over 500 000 |
| from | 1 000 001 to | 2 000 000 | 16 800 + 0.70% of amt. over 1 000 000 | 11 250 + 0.50% of amt. over 1 000 000 | 53 500 + 2.75% of amt. over 1 000 000 |
| from | 2 000 001 to | 5 000 000 | 23 800 + 0.30% of amt. over 2 000 000 | 16 250 + 0.25% of amt. over 2 000 000 | 81 000 + 1.12% of amt. over 2 000 000 |
| from | 5 000 001 to | 10 000 000 | 32 800 + 0.20% of amt. over 5 000 000 | 23 750 + 0.10% of amt. over 5 000 000 | 114 600 + 0.616% of amt. over 5 000 000 |
| from | 10 000 001 to | 50 000 000 | 42 800 + 0.07% of amt. over 10 000 000 | 28 750 + 0.05% of amt. over 10 000 000 | 145 400 + 0.193% of amt. over 10 000 000 |
| from | 50 000 001 to | 80 000 000 | 70 800 + 0.06% of amt. over 50 000 000 | 48 750 + 0.03% of amt. over 50 000 000 | 222 600 + 0.136% of amt. over 50 000 000 |
| from | 80 000 001 to | 100 000 000 | 88 800 | 57 750 + 0.02% of amt. over 80 000 000 | 263 400 + 0.112% of amt. over 80 000 000 |
| over | | 100 000 000 | 88 800 | 61 750 + 0.01% of amt. over 100 000 000 | 285 800 + 0.056% of amt. over 100 000 000 |

(*)(**) See preceding page

46